91 Cal.Rptr.2d 687 (2000)
22 Cal.4th 106
990 P.2d 563
The PEOPLE, Plaintiff and Respondent,
v.
Larry Salvador MARTINEZ, Defendant and Appellant.
No. S062266.
Supreme Court of California.
January 10, 2000.
*691 David H. Goodwin, under appointment by the Supreme Court, Los Angeles, for Defendant and Appellant.
Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Sanjay T. Kumar, Jaime L. Fuster, John R. Gorey and Victoria Bedrossian, Deputy Attorneys General, for Plaintiff and Respondent.
CHIN, J.
In this case, we consider whether uncertified computer printouts reporting criminal history information are admissible as evidence that a defendant alleged to be a habitual offender (Pen.Code, § 667.7)[1] served prison terms for prior felony convictions. The Court of Appeal held that the trial court did not err in admitting the printouts under the official records exception to the hearsay rule (Evid.Code, § 1280). On the record of this case, we agree, and therefore affirm the judgment of the Court of Appeal.

FACTS
On July 16, 1994, defendant choked and raped an eight-year-old girl after taking her for a bicycle ride. In connection with these events, defendant later pleaded guilty to the crimes of forcible rape (§ 261, subd. (a)(2)), committing a forcible lewd act on a child (§ 288, subds. (a), (b)), and kidnapping someone under the age of 14 (§§ 207, 208, subd. (b)). He also admitted enhancement allegations for kidnapping to commit sexual assault and inflicting great bodily injury (§§ 667.8, subd. (b), 12022.7, subd. (a), 12022.8).
For sentencing purposes, the information also alleged defendant had sustained and served prison terms for the following California felony convictions: (1) in 1975, for assault with force likely to produce great bodily injury (case No. A438028); (2) in 1979, for false imprisonment with great bodily injury, rape by force and fear with great bodily injury, and assault with force likely to produce great bodily injury (case No. A447058); (3) in 1980, for assault with intent to commit rape (case No. A352194); and (4) in 1988, for assault on a peace officer with a deadly weapon (case No. A789375). Defendant did not admit these allegations, but waived jury trial.
At the ensuing bench trial in April 1995, the court judicially noticed the relevant superior court case files, except the file in case No. A789375, which was not available. These files contained documents relating to both criminal history (e.g., presentence reports) and identity (defendant's signature on various documents). The prosecution also submitted under section 969b certified prison records, including copies of the abstracts of judgment in cases Nos. A352194, A447058, and A789375 (the case with the unavailable file). The certified records did not, however, contain either a photograph or a fingerprint card. Therefore, the prosecution needed to establish a link between defendant and the Larry or Lawrence Martinez who was the subject of the documentary evidence.
To establish this link, the prosecution offered live testimony and numerous exhibits, including uncertified computer *692 printouts of criminal history information that John Helbling, a paralegal in the district attorney's office, generated on the day he testified at defendant's trial. Exhibit 7 was a printout from the Los Angeles County Sheriffs Department computer system, known as the Personal History Index (PHI), which reported criminal history information for an individual identified as Larry Salvador Martinez. Exhibit 9 was a printout from the Department of Justice (Department)[2] computer system, known as the California Law Enforcement Telecommunications System (CLETS), which reported criminal history information relating to an individual alternatively identified as Larry Salvador Martinez, Larry Martinez, or Lawrence Salvador Martinez.
Defendant objected that these exhibits were inadmissible hearsay. The prosecution responded that the exhibits were admissible under the official records exception to the hearsay rule (Evid.Code, § 1280). In support of its argument, the prosecution cited Helbling's testimony regarding the exhibits. Based on this testimony, the trial court admitted the exhibits under the official records exception to the hearsay rule.
After considering the evidence, the trial court found defendant had sustained prior convictions for the following felony offenses: (1) assault with force likely to produce great bodily injury; (2) rape with force likely to produce great bodily injury; (3) assault with intent to commit rape; and (4) assault with a deadly weapon on a peace officer.[3] It also found that because defendant received concurrent sentences for the second and third convictions, he had served three separate prior prison terms within the meaning of the habitual offender statute. (§ 667.7.) It therefore sentenced him under that statute to a prison term of life without possibility of parole plus five years.
Defendant appealed, arguing in part that the trial court erred in admitting exhibits 7 and 9 under the official records exception to the hearsay rule. The Court of Appeal affirmed the trial court's ruling, following People v. Dunlap (1993) 18 Cal. App.4th 1468, 23 Cal.Rptr.2d 204 (Dunlap ) and declining to follow People v. Matthews (1991) 229 Cal.App.3d 930, 280 Cal. Rptr. 134 (Matthews). We then granted review to address the admissibility of these exhibits.

DISCUSSION

I. Matthews and Dunlap

Matthews was the first published California decision to consider admission of computer printouts of criminal history information as evidence that a defendant suffered prior felony convictions and served prior prison terms. In Matthews, to prove that defendant Terrance Matthews was sentenced on May 22, 1984, for a robbery conviction, the prosecution offered a certified copy of a superior court record showing a robbery conviction for an individual named Carl Matthews. (Matthews, supra, 229 Cal.App.3d at p. 934, 280 Cal.Rptr. 134.) To establish that Terrance Matthews and Carl Matthews were the same person, the prosecution offered: (1) a computer printout labeled "`San Francisco Police Department Criminal History Record' for `Terry Matthews,'" showing sentencing on May 22, 1984, for a robbery conviction; and (2) an unlabeled computer printout for "Terry Matthews," who used "Carl T. Matthews" as an alias. (Id. at p. 934, fn. 2, 280 Cal.Rptr. 134, and accompanying text.) After admitting these printouts over objections based on hearsay and lack of foundation, the trial court found *693 Matthews had suffered the prior robbery conviction.
The First District Court of Appeal, Division One, reversed the trial court, finding that the evidence was inadmissible hearsay. For two reasons, it rejected the argument that the records were admissible under either the business records or the official records exceptions to the hearsay rule. First, the court reasoned the prosecution had failed to establish the foundational requirements for either exception because "no testimony was adduced about how [the records] were prepared or the sources of information used for the entries made." (Matthews, supra, 229 Cal.App.3d at p. 940, 280 Cal.Rptr. 134.) Second, citing our decision in People v. Guerrero (1988) 44 Cal.3d 343, 243 Cal.Rptr. 688, 748 P.2d 1150 (Guerrero), the court asserted: "[I]n any event, without the necessary certification to admit the [documents] as prison records under section 969b, we cannot depart from the rule that, other than certified prison records, only the `record of conviction' is admissible to prove a prior conviction. [Citations.] Consequently, if the [documents] cannot be admitted as certified prison records under section 969b, and they are not part of the `record of conviction' within the meaning of Guerrero, they are not admissible as business records or under any other exception to the hearsay rule to prove [Matthews's] prior conviction." (Matthews, supra, 229 Cal.App.3d at pp. 940-941, 280 Cal.Rptr. 134.)
A few years after Matthews, the Fifth District Court of Appeal took up the issue in Dunlap, which involved enhancement allegations against defendant Randle Dunlap under section 667.5, subdivision (b). The prosecution offered abstracts of judgment for two prior convictions and a CLETS computer printout of criminal history information "to show [Dunlap's] aliases (in order to link [him], through various spellings of his name, to the abstracts of judgment from the prior convictions), and to demonstrate that [he] had served a separate prison term for each of the prior convictions and had not stayed free of prison custody for a five-year period [citation]." (Dunlap, supra, 18 Cal. App.4th at p. 1472, 23 Cal.Rptr.2d 204.) The first page of the CLETS printout bore a stamp from the Kern County District Attorney's Office with the following statement: "`This is to certify that the above is a true and original document received from the California Law Enforcement Telecommunications System, by the District Attorney's Discovery Unit.'" (Ibid.) "Directly under [this statement] were spaces for the date and a clerk's name; hand-written into these spaces was the date `8-18-92' and an illegible name or set of initials." (Ibid.) The trial court admitted the CLETS printout, overruling Dunlap's objections based on Matthews, hearsay, and lack of foundation. (Ibid.)
The Court of Appeal affirmed the trial court's ruling. As a threshold issue, it rejected Matthews's assertion that "a prior conviction may be proved only through the `record of conviction' or certified prison records under section 969b." (Dunlap, supra, 18 Cal.App.4th at p. 1474, 23 Cal. Rptr.2d 204, original italics.) The court first explained that this assertion in Matthews was dictum, because "the [Matthews ] court had already concluded that the [documents] were inadmissible under any recognized exception to the hearsay rule...." (Dunlap, supra, 18 Cal.App.4th at p. 1474, 23 Cal.Rptr.2d 204.) More fundamentally, the Dunlap court concluded that the cases Matthews cited, including Guerrero, did not govern because they considered the scope of evidence admissible to prove that a conviction "was for conduct of a particular type," not that "the defendant had been convicted...." (Dunlap, supra, 18 Cal.App.4th at p. 1474, 23 Cal.Rptr.2d 204.) The court explained: "We see a substantial distinction between cases ... where the question is the substance of the prior conviction (i.e., the nature of the conduct giving rise to it), and cases ... in which the question is the fact *694 of the prior conviction or the additional fact that the defendant served a prison term within the meaning of section 667.5. As the Supreme Court pointed out in Guerrero, going beyond the record of conviction to prove its substance `threaten[s] the defendant with harm akin to double jeopardy and denial of speedy trial.' [Citation.] But no such danger is present when evidence other than court or prison records is used only to establish the fact of conviction and/or service of a prison term." (Id. at p. 1476, 23 Cal.Rptr.2d 204, original italics.) The court concluded: "Provided that other types of evidence (e.g., other official records) satisfy applicable rules for admissibility, they may be relied on to establish a prior conviction. [Citation.]" (Ibid.)
The Dunlap court then held that the CLETS printout was admissible under the official records exception to the hearsay rule (Evid.Code, § 1280). Although the prosecution presented no foundational evidence independent of the printout, the court nevertheless found the hearsay exception applicable based on statutes (which the court judicially noticed) establishing a duty of public employees to record and report a person's criminal history, and the presumption under Evidence Code section 664 that an official duty has been regularly performed. (Dunlap, supra, 18 Cal.App.4th at pp. 1477-1480, 23 Cal. Rptr.2d 204.) The court also again refused to follow Matthews, finding it factually distinguishable because the printout Matthews discussed "was `an unlabeled computer printout'" and there was "no indication [it] was generated by the CLETS system or any other statutorily authorized program." (Dunlap, supra, 18 Cal.App.4th at p. 1481, 23 Cal.Rptr.2d 204.) The court also questioned Matthews's reasoning, noting that the court there (1) "apparently overlook[ed]" the fact that the official records exception, unlike the business records exception, does not require foundational testimony by the custodian or other qualified witness as to the record's identity and mode of preparation, and (2) "did not discuss, and apparently did not consider, either judicial notice or the presumption that official duty was regularly performed, as those concepts might bear on the foundational issue." (Dunlap, supra, 18 Cal.App.4th at p. 1481, 23 Cal.Rptr.2d 204.)

II. Use of Evidence Other Than the Record of Conviction or Certified Prison Records Under Section 969b
We turn first to the threshold question of whether evidence other than the record of conviction and certified prison records under section 969b is admissible to show that a defendant served prison terms for prior felony convictions. As we explain, we agree with Dunlap, supra, 18 Cal.App.4th 1468, 23 Cal.Rptr.2d 204, that provided it satisfies applicable rules of admissibility, such evidence is admissible to establish matters other than the nature and circumstances of the conduct underlying a prior conviction.
We begin by considering the language of section 969b, which provides in relevant part: "For the purpose of establishing prima facie evidence of the fact that a person being tried for a crime or public offense under the laws of this State has been convicted of an act punishable by imprisonment in a state prison, county jail or city jail of this State, and has served a term therefor in any penal institution, ... the records or copies of records of any state penitentiary, reformatory, county jail, city jail, or federal penitentiary in which such person has been imprisoned, when such records or copies thereof have been certified by the official custodian of such records, may be introduced as such evidence." (Italics added.) As defendant explains, section 969b is essentially "a hearsay exception" that allows certified copies of the specified records "to be used for the truth of the matter asserted in those records," i.e., that a person served a prison term for a prior conviction. (See People v. Castillo (1990) 217 Cal.App.3d *695 1020, 1024, fn. 5, 266 Cal.Rptr. 271.) However, section 969b "`is permissive and not mandatory.... [I]t does not restrict the People from using other forms of proof...' to establish the fact of previous imprisonment. [Citation.]" (People v. Hill (1967) 67 Cal.2d 105, 122, 60 Cal.Rptr. 234, 429 P.2d 586.) "No statute requires the prosecution to produce the [section 969b] prison packet" to prove that a defendant served a prior prison term. (People v. Tenner (1993) 6 Cal.4th 559, 563, 24 Cal.Rptr.2d 840, 862 P.2d 840, original italics.)
Next, we consider the extent to which Guerrero limits admission of evidence other than certified prison records under section 969b to show that a defendant served a prison term for a prior felony conviction. Guerrero reconsidered People v. Alfaro (1986) 42 Cal.3d 627, 230 Cal.Rptr. 129, 724 P.2d 1154 (Alfaro), which addressed the scope of evidence a trier of fact may consider in determining whether "a prior conviction was a `serious felony'" for purposes of sentence enhancement. (Guerrero, supra, 44 Cal.3d at p. 345, 243 Cal.Rptr. 688, 748 P.2d 1150.) In both cases, the prosecution sought to prove that the prior conviction was for burglary of a residence. (Id. at p. 348, 243 Cal.Rptr. 688, 748 P.2d 1150; Alfaro, supra, 42 Cal.3d at p. 630, 230 Cal.Rptr. 129, 724 P.2d 1154.) Alfaro held that in determining this question, the trier of fact "was limited to matters necessarily established by the prior judgment of conviction." (Guerrero, supra, 44 Cal.3d at p. 348, 243 Cal.Rptr. 688, 748 P.2d 1150.) In Guerrero, we concluded that the authorities on which Alfaro relied did not support this evidentiary limitation. Specifically, we explained that In re McVickers (1946) 29 Cal.2d 264, 176 P.2d 40 established that a court "may look to the entire record of the conviction to determine the substance of [a] prior foreign conviction; but when the record does not disclose any of the facts of the offense actually committed, the court will presume that the prior conviction was for the least offense punishable under the foreign law." (Guerrero, supra, 44 Cal.3d at p. 352, 243 Cal.Rptr. 688, 748 P.2d 1150, italics added.) We also explained that In re Seeley (1946) 29 Cal.2d 294, 176 P.2d 24 and In re Finley (1968) 68 Cal.2d 389, 66 Cal.Rptr. 733, 438 P.2d 381 "recognized and applied" the In re McVickers rule that a court may look to the entire record of the conviction to determine "the substance" of the prior conviction. (Guerrero, supra, 44 Cal.3d at pp. 354, 355, 243 Cal.Rptr. 688, 748 P.2d 1150.) We concluded that, "far from establishing that proof of the substance of a prior conviction is limited to matters necessarily established by the prior judgment of conviction, those cases declare that the court may look to the entire record of the conviction for this purpose," i.e., to establish the substance of the prior conviction. (Id. at p. 355, 243 Cal.Rptr. 688, 748 P.2d 1150, italics added.)
Although Guerrero contains language arguably suggesting its evidentiary limitations apply to proof of all issues related to "the truth of a prior-conviction allegation" (Guerrero, supra, 44 Cal.3d at p. 345, 243 Cal.Rptr. 688, 748 P.2d 1150), a close reading of the decision demonstrates its scope is not so sweeping. As our discussion shows, the only question at issue in Guerreroand in Alfaro, which Guerrero reconsideredwas the permissible scope of proof to establish the substance of a prior conviction, i.e., the nature and circumstances of the underlying conduct. Neither case considered matters of proof relating to other aspects of a prior conviction, such as the identity of the defendant or service of a prior prison term. Cases are not authority for propositions they do not consider. (Roberts v. City of Palmdale (1993) 5 Cal.4th 363, 372, 20 Cal.Rptr.2d 330, 853 P.2d 496.) As we have subsequently explained, Guerrero establishes that the trier of fact may look to the entire record of conviction to determine "the substance of the prior conviction. [Citation.]" (People v. Reed (1996) 13 Cal.4th 217, 223, 52 Cal.Rptr.2d 106, 914 P.2d 184.) Its limitations apply only *696 to proof of "the circumstances of the prior crime." (Id at p. 225, 52 Cal.Rptr.2d 106, 914 P.2d 184.)
Moreover, the justifications for limiting proof of the substance of a prior conviction do not apply to proof of the matter at issue here, i.e., the identity of the person who served prison terms for the prior convictions. As Guerrero explains, the rule limiting proof of the substance of a prior conviction "effectively bars the prosecution from relitigating the circumstances of a crime committed years ago and thereby threatening the defendant with harm akin to double jeopardy and denial of speedy trial." (Guerrero, supra, 44 Cal.3d at p. 355, 243 Cal.Rptr. 688, 748 P.2d 1150.) Alfaro noted that limiting proof of the substance of a prior conviction also "avoid[s] the `great inconvenience' of relitigating the circumstances of long past convictions." (Alfaro, supra, 42 Cal.3d at p. 635, 230 Cal.Rptr. 129, 724 P.2d 1154.) Permitting the prosecution to introduce evidence other than the record of conviction or certified prison records under section 969b to show the identity of the person who served prison terms for prior convictions does not implicate these concerns. Thus, the reasons underlying Guerrero's rule do not justify extending its reach to the matter at issue here.
Defendant argues, however, that by not referring to "CLETS and other criminal records data banks" in enacting or amending several statutes expressly dealing with the use of computer records, the Legislature "has indicated these records do not qualify under" an exception to the hearsay rule other than section 969b. Principally, he cites enactment in 1996 (well after his trial) of the Criminal Convictions Record Act (CCRA) (Stats.1996, ch. 642), which provides in part that: (1) superior and municipal court clerks "shall prospectively certify and submit" for entry into the Department's computer system specified court records that relate to criminal convictions (Gov.Code, §§ 69844.5, 71280.5); (2) a court may judicially notice these "computer-generated official court records" under Evidence Code section 452 (Evid.Code, § 452.5, subd. (a)); and (3) "[a]n official record of conviction certified in accordance with subdivision (a) of [Evidence Code] Section 1530 is admissible pursuant to [Evidence Code] Section 1280 to prove the commission ... of a criminal offense, prior conviction, service of a prison term, or other act, condition, or event recorded by the record." (Evid.Code, § 452.5, subd. (b).) Defendant argues the Legislature's failure to address the admissibility of CLETS records when it enacted these provisions, despite its presumed awareness of Matthews, supra, 229 Cal.App.3d 930, 280 Cal.Rptr. 134, suggests its acquiescence in Matthews and its intent that CLETS records not be used as evidence of prior convictions and service of prior prison terms.
Defendant's arguments are unpersuasive. The Legislature declared that the CCRA's purpose was merely "to simplify recordkeeping and admission in evidence of records of criminal convictions by establishing a central computer data base of that data, and by authorizing admission in evidence of this computer data." (Stats. 1996, ch. 642, § 2, italics added.) In enacting the CCRA, the Legislature did not question the accuracy or trustworthiness of existing information sources, such as CLETS. On the contrary, in describing the legal background to the CCRA, one legislative analysis explained that "prosecutors receive preliminary criminal history information through [the Department's] Criminal Identification and Information System," which "provides timely accurate posting of criminal history data." (Assem. Com. on Public Safety, 3d reading analysis of Assem. Bill No. 1387 (1995-1996 Reg. Sess.) as amended Jan. 22, 1996, p. 2, italics added.) Moreover, in arguing that the Legislature endorsed Matthews by passing the CCRA in August 1996 without mentioning CLETS, defendant ignores two significant facts: (1) Matthews did not identify the computer printout there at issue as a CLETS document, but referred *697 to it as "an unlabeled computer printout" (Matthews, supra, 229 Cal.App.3d at p. 934, 280 Cal.Rptr. 134) or a "state rap sheet[]" (id. at p. 935, 280 Cal.Rptr. 134); and (2) the Legislature was also presumably aware of Dunlap, supra, 18 Cal. App.4th 1468, 23 Cal.Rptr.2d 204, which was issued in September 1993. Thus, we do not agree that by establishing through the CCRA a simplified process for proving facts relating to a defendant's criminal history, the Legislature intended to exclude other methods of proof, such as admission of CLETS records.[4]

III. Application of the Official Records Exception to the Hearsay Rule
We now turn to the trial court's application of the official records exception to exhibits 7 and 9. At the time of defendant's trial, Evidence Code section 1280 provided: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) [t]he writing was made by and within the scope of duty of a public employee; [¶] (b) [t]he writing was made at or near the time of the act, condition, or event; and [¶] (c) [t]he sources of information and method and time of preparation were such as to indicate its trustworthiness." (Stats.1965, ch. 299, § 2, p. 1343.) A trial court has broad discretion in determining whether a party has established these foundational requirements. (People v. Beeler (1995) 9 Cal.4th 953, 978, 39 Cal.Rptr.2d 607, 891 P.2d 153.) Its ruling on admissibility "implies whatever finding of fact is prerequisite thereto; a separate or formal finding is, with exceptions not applicable here, unnecessary. (Evid.Code, § 402, subd. (c).)" (People v. Williams (1997) 16 Cal.4th 153, 196, 66 Cal.Rptr.2d 123, 940 P.2d 710.) A reviewing court may overturn the trial court's exercise of discretion "`only upon a clear showing of abuse.'" (People v. Beeler, supra, 9 Cal.4th at p. 979, 39 Cal.Rptr.2d 607, 891 P.2d 153; see also People v. Jones (1998) 17 Cal.4th 279, 308, 70 Cal.Rptr.2d 793, 949 P.2d 890 [appellate court reviews admission of record under a hearsay exception "for an abuse of discretion"].) Thus, we must determine whether the trial court abused its discretion in admitting exhibits 7 and 9 as official records.
As an initial step, we set forth the background of John Helbling, who testified regarding the exhibits in question. As of April 5, 1995, the date of his testimony, Helbling had worked for five years as a paralegal for the Norwalk office of the Los Angeles District Attorney. In this position, he could access the systems for collecting and reporting criminal history information of both the Department of Justice and the Los Angeles County Sheriffs Department. His job duties included obtaining records from state prison. Helbling testified generally as to his familiarity with different record-keeping systems around the state. He explained that for "quit[e] awhile," he had been working with the district attorney in connection with probation violations and had "learned a lot" about the intricacies of the information systems. In Helbling's experience, the names "Lawrence" and "Martinez" were both common. Therefore, Helbling exercised care and caution in obtaining criminal history information relating to Lawrence Martinez.

A. CLETS Printout (Exhibit 9)
Helbling testified that exhibit 9 was a printout of criminal history information relating to an individual the printout identified alternatively as Larry Salvador Martinez, Larry Martinez, or Lawrence Salvador Martinez, born June 15, 1955. Shortly before testifying, Helbling obtained the printout from the Department's CLETS *698 computer system. Helbling explained that various identification numbers and criminal history information on the CLETS printout matched identification numbers and criminal history information on other exhibits.
More generally, Helbling testified that CLETS printouts report statewide information regarding a person's criminal history. According to Helbling, police departments, district attorneys, and courts are all involved in reporting information to the Department. Helbling was familiar with the forms these law enforcement agencies used to forward information to the Department at each step of the criminal process. Helbling was also familiar with Dunlap, supra, 18 Cal.App.4th 1468, 23 Cal.Rptr.2d 204, and he testified that its discussion of the information-reporting obligations of California law enforcement agencies corresponded with his experience. Helbling also explained that the Department would add information about an incident to a person's criminal history only after verifying the person's identity using fingerprints. Helbling also explained that someone authorized to use CLETS obtains criminal history information about a person by entering into the computer a California Identification Index (CII) number, which can be obtained using the person's name, date of birth, driver's license number, or Social Security number.
In addition to considering Helbling's testimony to determine the admissibility of the CLETS printout, the trial court could take judicial notice under Evidence Code section 451, subdivision (a), of the following statutes that, from the date of the first prior conviction at issue in this case (July 1975) to the present, have imposed obligations on California law enforcement agencies relating to compiling and reporting criminal history information.
1. Section 11101: Since 1953, this section has required the California Attorney General, who is the head of the Department (Gov.Code, § 12510), to "procure from any available source, and file for record and report in the office of the bureau, all ... information ... of all persons convicted of a felony, or imprisoned for violating any of the military, naval, or criminal laws of the United States, and of all well-known and habitual criminals."
2. Section 11104: Since 1953, this section has required the California Attorney General to "file all ... information ... received and ... make a complete and systematic record and index, providing a method of convenience, consultation and comparison."
3. Section 11105: Between 1972 and its repeal in September 1975, this section required the California Attorney General to "furnish, upon [proper] application ..., copies of all summary criminal history information pertaining to the identification of any person" to, among other agencies, "all peace officers, district attorneys, probation officers, and courts of the state...." (Stats.1972, ch. 1377, § 82.2, p. 2937.) Since then, this section has required the Department to "maintain state summary criminal history information" and "furnish" it to "[t]he subject of the information and to, among others, state courts, peace officers, prosecuting city attorneys, state district attorneys, and public defenders "when needed in the course of their duties."
4. Section 11107: In 1975, section 11107 provided that "[e]ach sheriff, chief of police and city marshal shall furnish to the department daily reports ... listing ... all felonies committed in his jurisdiction, describing the nature and character ... of each such crime together with any additional or supplemental data or information including all statements and conversations of persons arrested...." (Stats.1972, ch. 1377, § 82.3, p. 2838.) Since its amendment in 1978, section 11107 has required each sheriff or police chief executive to furnish to the Department daily reports only as to misdemeanors and felonies the Attorney General specifies, including, but not limited to, "forgery, fraud-bunco, bombings, *699 receiving or selling stolen property, safe and commercial burglary, grand theft, child abuse, homicide, threats, and offenses involving lost, stolen, found, pledged or pawned property."
5. Section 11115, former section 11116, and section 11117: The 1972 version of section 11115 provided that "[i]n any case in which a sheriff, police department or other law enforcement agency makes an arrest and transmits a report of the arrest to the Department of Justice or to the Federal Bureau of Investigation, it shall be the duty of such law enforcement agency to furnish a disposition report to such agencies whenever the arrested person is transferred to the custody of another agency...." (Stats.1972, ch. 1377, § 84, p. 2839.) The section also provided that "[w]hen a complaint or accusation has been filed with a court against such an arrested person, the law enforcement agency having primary jurisdiction to investigate the offense alleged therein shall receive a disposition report of that case from the appropriate court and shall transmit a copy of the disposition report to all the bureaus to which arrest data has been furnished." (Ibid.)
The 1972 version of former section 11116 provided that "[w]henever a criminal complaint or accusation is filed in any superior, municipal or justice court, the clerk, or, if there be no clerk, the judge of that court shall furnish a disposition report of such case to the sheriff, police department or other law enforcement agency primarily responsible for the investigation of the crime alleged in a form prescribed or approved by the Department of Justice." (Stats.1972, ch. 1377, § 85, p. 2840.)
In turn, the 1972 version of section 11117 required the Department to "prescribe and furnish the procedures and forms to be used for the disposition reports required in this article." (Stats.1972, ch. 1377, § 86, p. 2841.) It also provided that the required disposition reports "shall be forwarded to the department ... within 30 days after the release of the arrested or detained person or the termination of court proceedings" and required the Department to "add the disposition reports received to all appropriate criminal records." (Ibid.)
6. Section 13151: In 1978, the Legislature modified the courts' reporting duty by repealing former section 11116 and enacting section 13151, which provides: "The ... court that disposes of a case for which an arrest was required to be reported to the Department of Justice pursuant to Section 13150 ... shall assure that a disposition report of such case ... is furnished to the Department of Justice within 30 days according to the procedures and on a format prescribed by the department. The court shall also furnish a copy of such disposition report to the law enforcement agency having primary jurisdiction to investigate the offense alleged in the complaint or accusation." (Stats.1978, ch. 152, §§ 3, 11, pp. 376, 378.) In connection with this change, the Legislature also: K(a) amended section 11117 by adding court disposition reports required by section 13151 to the list of reports that the Department must include in its criminal records (Stats.1978, ch. 152, § 9, pp. 377-378); and (b) amended section 11115 by deleting the paragraph that required law enforcement agencies to transmit court disposition reports to designated agencies. (Stats.1978, ch. 152, § 2, p. 376.) However, regarding the continuing duty of law enforcement agencies to provide the Department with other specified disposition reports, the Legislature added a sentence to section 11115 requiring that the reports "be furnished to the appropriate agencies within 30 days of release or transfer to another agency." (Stats.1978, ch. 152, § 2, p. 376.)
7. Section 13100: The Legislature enacted section 13151 as part of a new chapter to the Penal Code (operative July 1, 1978) relating to criminal offender record information. In section 13100, the first section of the new chapter, the Legislature made the following findings and declarations: *700 (a) California criminal justice agencies "require, for the performance of their official duties, accurate and reasonably complete criminal offender record information"; (b) "the Legislature and other governmental policymaking or policy-researching bodies, and criminal justice agency management units require greatly improved aggregate information for the performance of their duties"; (c) "policing agencies and courts require speedy access to information concerning all felony and selected misdemeanor arrests and final dispositions of such cases"; (d) "criminal justice agencies may require regular access to detailed criminal histories relating to any felony arrest that is followed by the filing of a complaint"; and (e) to achieve these goals, "the recording, reporting, storage, analysis, and dissemination of criminal offender record information in this state must be made more uniform and efficient, and better controlled and coordinated."
8. Sections 13150 and 13152: As part of the new chapter operative July 1, 1978, the Legislature also enacted section 13150, which provides that "[f]or each arrest made, the reporting agency shall report to the Department of Justice, concerning each arrest, the applicable identification and arrest data described in Section 13125 and fingerprints, except as otherwise provided by law or as prescribed by the Department of Justice." The identification and arrest data section 13125 describes include the offender's name (including aliases and monikers), date of birth, address, Social Security and California driver's license numbers, CII and FBI numbers, booking number, date of arrest, and offenses charged. The Legislature also enacted section 13152, which provides that "[a]dmissions or releases from detention facilities shall be reported by the detention agency to the Department of Justice within 30 days of such action."
9. Sections 13175 and 13176: The Legislature also included in the new chapter two sections imposing time limits for the Department to respond to requests for information. Section 13175 provides that "[w]hen a criminal justice agency supplies fingerprints, or a fingerprint identification number, or such other personal identifiers as the Department of Justice deems appropriate, to the Department of Justice, such agency shall, upon request, be provided with identification, arrest, and, where applicable, final disposition data relating to such person within 72 hours of receipt by the Department of Justice." Section 13176 provides that, "[w]hen a criminal justice agency entitled to such information supplies fingerprints, or a fingerprint identification number, or such other personal identifiers as the Department of Justice deems appropriate, to the Department of Justice, such agency shall, upon request, be provided with the criminal history of such person, or the needed portion thereof, within 72 hours of receipt by the Department of Justice."
10. CLETS (Gov.Code, §§ 15150-15167): The Department's duty to establish and maintain CLETS dates back to 1965, when the Legislature enacted Government Code section 15152. (Stats.1965, ch. 1595, § 1, p. 3687.) That section provides: "The Department of Justice shall maintain a statewide telecommunications system of communication for the use of law enforcement agencies." (Gov.Code, § 15152.)[5] The Legislature specified that CLETS "shall be maintained at all times with equipment and facilities adequate to the needs of law enforcement" and "shall be designed to accommodate present and future data processing equipment." (Gov. Code, § 15164.) The Legislature placed CLETS "under the direction of the Attorney General" (Gov.Code, § 15153) and required the Attorney General to "adopt and publish ... operating policies, practices *701 and procedures...." (Gov.Code, § 15160.) It also directed the Attorney General to appoint an advisory committee (Gov.Code, § 15154) with the responsibility, among others, to recommend system improvements "to take advantage of advancements made in the science of telecommunications communications." (Gov. Code, § 15164.) As to its intent in establishing CLETS, the Legislature explained: "The maintenance of law and order is, and always has been, a primary function of government.... The state has an unmistakable responsibility to give full support to all public agencies of law enforcement. This responsibility includes the provision of an efficient law enforcement communications network available to all such agencies. It is the intent of the Legislature that such a network be established and maintained in a condition adequate to the needs of law enforcement." (Gov.Code, § 15151.)
In applying the official records exception, these statutory reporting and recording duties are significant because, under Evidence Code section 664, "[i]t is presumed that official duty has been regularly performed." This presumption "affect[s] the burden of proof (Evid.Code, § 660), meaning that the party against whom it operateshere, the defendant has "the burden of proof as to the nonexistence of the presumed fact." (Evid.Code, § 606; see also Tate v. Superior Court (1975) 45 Cal.App.3d 925, 929, 119 Cal. Rptr. 835.) California courts have applied this presumption in finding that proffered evidence satisfies the foundational requirements of the official records exception. (E.g., Preis v. American Indemnity Co. (1990) 220 Cal.App.3d 752, 759, 269 Cal. Rptr. 617; cf. Robinson v. Puis (1946) 28 Cal.2d 664, 668, 171 P.2d 430 [applying other statutory presumptions to find satisfaction of time requirement of business records exception].) California courts have also held that this presumption applies to actions of trial judges, court clerks, and police officers. (Younesi v. Lane (1991) 228 Cal.App.3d 967, 974, 279 Cal. Rptr. 89; Fisk v. Department of Motor Vehicles (1981) 127 Cal.App.3d 72, 77, 179 Cal.Rptr. 379 (Fisk).)
Defendant argues, however, that the Legislature has indicated its intent to require a party "to prove the foundation" rather than establish it by presumption. (Original italics.) He bases this argument on a 1996 amendment (again, after his trial) to Evidence Code section 1280 that added the phrase, "all of the following applies," immediately before enumeration of the official records exception's three foundational requirements. (Stats.1996, ch. 642, § 4.)
Defendant misinterprets the significance of this amendment. As we have previously set forth, Evidence Code section 1280 originally (and at the time of defendant's trial) enumerated its three foundational requirements in the conjunctive, with the word "and" appearing at the end of subdivision (b) ("The writing was made at or near the time of the act, condition, or event; and...."). (Stats.1965, ch. 299, § 2, p. 1343.) The 1996 amendment deleted the word "and" at the end of subdivision (b) and inserted immediately before the first of the three requirements the phrase defendant cites. (Stats.1996, ch. 642, § 4.) We conclude this amendment simply restated the same principlethat all three requirements must be metusing slightly different language, and did not, as defendant suggests, alter the section's substance or meaning. Defendant cites, and we have found, nothing in the legislative history of the CCRA that suggests otherwise.
Given the presumption under Evidence Code section 664 and Helbling's testimony, the trial court did not abuse its discretion in finding that the CLETS printout "was made by and within the scope of duty of a public employee." (Evid.Code, § 1280, subd. (a).) As we have explained, at the time of the prior convictions at issue in this case, California *702 law enforcement agencies and courts had statutory duties to report criminal history information to the Department, and the Department had statutory duties to collect the reported information and make it available through CLETS. Under Evidence Code section 664, "[i]t is presumed" these duties were "regularly performed," and defendant offered no evidence to the contrary. Thus, the CLETS printout satisfied the first requirement of the official records exception.[6]
We also conclude the trial court did not abuse its discretion in finding that the CLETS printout met the second requirement of the official records exception, i.e., that it "was made at or near the time of the act, condition, or event." (Evid.Code, § 1280, subd. (b).) In applying this requirement to computer printouts from a database, we consider the length of time between the act, condition, or event and the date of its recording, not the date of its eventual retrieval by computer printout. (Aguimatang v. California State Lottery (1991) 234 Cal.App.3d 769, 798, 286 Cal.Rptr. 57.)
Although the CLETS printout itself does not indicate when the information was reported or recorded, the statutes we have previously discussed are relevant to this question. At the time of the post-1978 convictions at issue in this case, Penal Code provisions required courts to assure that disposition reports were furnished to the Department "within 30 days" of disposing of cases (§ 13151), that detention agencies report admissions and releases to the Department "within 30 days of such action" (§ 13152), and that law enforcement agencies provide the Department with disposition reports within 30 days of a person's release or transfer to another agency (§ 11115). At the time of the 1975 conviction, former section 11117 required disposition reports to "be forwarded to the department ... within 30 days after ... termination of court proceedings." (Stats. 1972, ch. 1377, § 86, p. 2841.) Also, before 1979, section 11107 required sheriffs and police chiefs to submit to the Department daily reports of all felonies committed in their jurisdictions, and since then has required submission of daily reports of specified felonies, including some that appear on the CLETS printout in this case. Under Evidence Code section 664, "[i]t is presumed" these statutory reporting duties were "regularly performed." Thus, the trial court did not abuse its discretion in concluding that information regarding the prior convictions listed in the CLETS printout was recorded and sent to the Department "at or near the time" of the convictions. (Evid.Code, § 1280, subd. (b).)
The statutes are less specific regarding the Department's duty to enter the criminal information it receives into the CLETS database. Since 1953, before CLETS was statutorily established, section 11104 has required the Attorney General to "file all ... information and descriptions received and [to] make a complete and systematic record and index, providing a method of convenience, consultation, and comparison." At least since 1972, section 11117 has required the Department to "add [the case disposition] reports [it] receive[s] to all appropriate criminal records." Before 1975, former section 11105, subdivision (a), required the Attorney General, "upon application," to furnish "all summary criminal history information pertaining to the identification of any person ... or any data about such person of which there is a record in the office of the department." (Stats.1975, ch. 425, § 1, p. 916; Stats. 1972, ch. 1377, § 82.2, p. 2837.) Since 1975, present section 11105, subdivision (b), has required the Attorney General to *703 "furnish state summary criminal history information" to specified persons and agencies "[when] needed in the course of their duties." And, since 1978, sections 13175 and 13176 have required the Department to provide criminal history information to criminal justice agencies "within 72 hours" of receiving an information request. Section 13100, subdivision (e), declares that the purpose of the Department's 72-hour reporting duty is "to achieve" the following: (1) providing criminal justice agencies with "accurate and reasonably complete criminal offender record information" (§ 13100, subd. (a)); and (2) providing policing agencies and courts with "speedy access" to information concerning final dispositions in "all felony" cases (§ 13100, subd. (c), italics added). Based on these provisions, we conclude the Department had a statutory duty to record the information detailed in the CLETS printout "within a short period of its receipt from the reporting agency." (Dunlap, supra, 18 Cal.App.4th at p. 1479, 23 Cal.Rptr.2d 204.) And, given the statutory presumption that this duty was "regularly performed" (Evid.Code, § 664), we also conclude the trial court did not abuse its discretion in finding that the CLETS printout met the timeliness requirement of the official records exception.
In reaching this conclusion, we observe that the timeliness requirement "is not to be judged ... by arbitrary or artificial time limits, measured by hours or days or even weeks." (Missouri Pacific Railroad Company v. Austin (5th Cir.1961) 292 F.2d 415, 423.) Rather, "account must be taken of practical considerations," including "the nature of the information recorded" and "the immutable reliability of the sources from which [the information was] drawn." (Ibid.) "Whether an entry made subsequent to the transaction has been made within a sufficient time to render it within the [hearsay] exception depends upon whether the time span between the transaction and the entry was so great as to suggest a danger of inaccuracy by lapse of memory." (2 McCormick on Evidence (4th ed.1992) § 289, p. 273, fn. omitted.) As to the records in question here, the Department's entry into CLETS of criminal information it receives does not depend on memory, but simply involves a transfer of information from one form of storagethe disposition reportsto anotherthe CLETS database. Under these circumstances, the Department's statutory recording duties are sufficiently specific to support the trial court's discretionary determination that the CLETS printout met the timeliness requirement of the official records exception. (See Standard Oil Company of California v. Moore (9th Cir.1958) 251 F.2d 188, 223 ["occasional time lags of several months" between transfer of entries from cash register tapes to ledger did not render ledger inadmissible absent evidence the delay "introduced inaccuracies or uncertainty as to" reliability]; People v. Klein (N.Y.App.Div. 1984) 105 A.D.2d 805, 481 N.Y.S.2d 743, 744, affd. (1985) 65 N.Y.2d 613, 491 N.Y.S.2d 155, 480 N.E.2d 744; Matter of "Male" G (N.Y.Fam.Ct.1978) 97 Misc.2d 283, 411 N.Y.S.2d 102, 103; Martin v. Glenn's Furniture Company, Inc. (1972) 126 Ga.App. 692, 191 S.E.2d 567, 570.)[7]
*704 The third requirement of the official records exception is that "[t]he sources of information and method and time of preparation were such as to indicate [the record's] trustworthiness." (Evid.Code, § 1280, subd. (c).) According to the Law Revision Commission's comment to Evidence Code section 1280, unlike the business records exception, which "requires a witness to testify as to the identity of the record and its mode of preparation in every instance," Evidence Code section 1280 "permits the court to admit an official record or report without necessarily requiring a witness to testify as to its identity and mode of preparation if the court takes judicial notice or if sufficient independent evidence shows that the record or report was prepared in such a manner as to assure its trustworthiness." (Cal. Law Revision Com. com., reprinted at 29B pt. 4 West's Ann. Evid.Code (1995 ed.) foil. § 1280, p. 347.) Because the Legislature adopted section 1280 exactly as the Law Revision Commission proposed, these comments are persuasive evidence of the Legislature's intent. (People v. Garfield (1985) 40 Cal.3d 192, 199, 219 Cal.Rptr. 196, 707 P.2d 258.) Indeed, because both the Senate and Assembly Committees on the Judiciary expressly stated that these comments "reflect[ed] [their] intent" in approving section 1280, the comments "are declarative of the intent ... of the legislators who ... enacted it." (Kaplan v. Superior Court (1971) 6 Cal.3d 150, 158, fn. 4, 98 Cal.Rptr. 649, 491 P.2d 1; see also 1 Assem. J. (1965 Reg. Sess.) p. 1712; 2 Sen. J. (1965 Reg. Sess.) p. 1573.)
Under these principles, the trial court did not abuse its discretion in concluding that the CLETS printout met the third requirement of the official records exception. Again, in addition to Helbling's testimony, the trial court could take judicial notice of the statutes we have discussed that impose reporting and recording duties. Those statutes establish that the sources of the information in the CLETS printout were public employees of California who had a duty to observe, report, record, and disseminate the information. *705 "None of the information reflects the opinions or conclusions of the reporting employees." (Dunlap, supra, 18 Cal.App.4th at p. 1479, 23 Cal.Rptr.2d 204.) Moreover, the Legislature has stressed the need for accuracy in the performance of these statutory duties. When it established CLETS in 1965, the Legislature directed that the system "be consistent with [certain] functional specifications" (Gov.Code, § 15161), including one requiring that "[a] preventative maintenance program ... be established on a regularly scheduled basis to insure that all machines and equipment are in satisfactory working order." (21 Assem. Interim Com. on Ways and Means Rep. No. 9, Automated Data Processing (1963-1965) p. 78, 2 Appen. to Assem. J. (1965 Reg. Sess.).) And, in 1973, when it added the new chapter to the Penal Code regarding criminal history information (operative July 1, 1978), the Legislature stressed that California criminal justice agencies "require, for the performance of their official duties, accurate and reasonably complete criminal offender record information" (§ 13100, subd. (a), italics added) and directed that recording, reporting, storage and dissemination of criminal history information "be made more uniform and efficient, and better controlled and coordinated." (§ 13100, subd. (e).) Under these statutes, "the public employees involved in the recording or reporting of criminal offender record information in the CLETS system have a duty to employ methods ensuring a reasonable level of accuracy and reliability." (Dunlap, supra, 18 Cal.App.4th at p. 1480, 23 Cal.Rptr.2d 204.) "[T]he trustworthiness of the method of preparation of the record is ... supported by the presumption, contained in Evidence Code section 664, that `official duty has been regularly performed.'" (Fisk, supra, 127 Cal.App.3d at p. 77, 179 Cal.Rptr. 379; see also People v. Baeske (1976) 58 Cal.App.3d 775, 780, 130 Cal. Rptr. 35 [trustworthiness requirement "is established by a showing that the [record] is based upon the observations of public employees who have a duty to observe the facts and report and record them correctly"].) "This presumption shifts the burden of proving the foundational issue of trustworthiness of the method of preparing the official writing to the party objecting to the admission of the official writing. [Citation.]"[8] (Preis v. American Indemnity Co., supra, 220 Cal.App.3d at p. 759, 269 Cal.Rptr. 617.)
In addition, in 1971 the Legislature added an article to the Penal Code to establish a process for review and correction of the criminal history information in the Department's possession. (§ 11120 et seq.) The Legislature specifically designed this process "to afford persons concerning whom a record [of criminal history information] is maintained in the files" of the Department an opportunity "to refute any erroneous or inaccurate information contained" in those files. (§ 11121, added by Stats.1971, ch. 1439, § 1, p. 2844.) To accomplish this goal, since its enactment, section 11121 has required the Department either to furnish applicants with copies of their criminal records (§ 11124) or to permit them to examine their records. Applicants who "desire[] to question the accuracy or completeness" of anything in their records "may submit a written request" to *706 the Department, including a statement of the alleged inaccuracy or omission and "any proof or corroboration available." (§ 11126, subd. (a).) The Department must then forward the request to the agency that provided the questioned information, which must review the request and report its conclusion to the Department within 30 days. (§ 11126, subd. (a).) A reviewing agency that agrees with the applicant must correct its records and notify the Department and others to which it has sent the incorrect record. The Department must then correct its records, notify the applicant of the correction within 30 days, and notify those to which it has sent the incorrect record. (§ 11126, subd. (b).) If the reviewing agency finds no error, then the matter is "referred for administrative adjudication," subject to judicial review. (§ 11126, subd. (c).) This statutory process, which the Legislature designed to promote the accuracy of the Department's criminal history information, further supports the trial court's finding that the CLETS printout met the third requirement of the official records exception.
Finally, other evidence before the trial court also supports its trustworthiness finding. Margarita Barron, a deputy sheriff with the Los Angeles County Sheriffs Department, was the chief detective investigating the crimes defendant committed in this case. At trial, she testified that while questioning defendant in July 1994, she asked him about criminal history information she had obtained using his CII number. Defendant did not dispute any of the information Detective Barron related to him, including his status as a "sex [offender] registrant." Defendant also stated he was a parolee and had been in state prison more than twice, including commitments for robbery and rape. This information was consistent with the CLETS printout. Thus, Detective Barron's testimony further supports the trial court's finding that the CLETS printout met the trustworthiness requirement of the official records exception.
In challenging the trial court's trustworthiness finding, defendant emphasizes that the CLETS printout is a government computer record. He argues that because "[m]any of the normal checks on computer misinformation that exist in the corporate/business world do not exist" as to government computer systems, CLETS records lack the "special indicia of reliability" that characterize more typical business computer records. In support of this argument, he asserts that "a private citizen does not have access to CLETS ... and cannot verify the accuracy of information in his or her file." He also asserts that unlike "`off-the-shelf,' `canned,' commercial [software] programs," which "market forces monitor" for accuracy, the CLETS computer software program is "unique" and its "general reliability" has not been, and cannot be, tested. Therefore, defendant contends, CLETS computer records "do not meet the level of scrutiny that would allow for their admissibility."
Defendant's arguments are unpersuasive. First, as we have already explained, in 1971 the Legislature statutorily established a process for review and correction of the criminal history information in the Department's possession. (§ 11120 et seq.) Thus, defendant's assertion that private citizens cannot verify the Department's information is incorrect. Second, our courts have refused to require, as a prerequisite to admission of computer records, testimony on the "acceptability, accuracy, maintenance, and reliability of ... computer hardware and software." (People v. Lugashi (1988) 205 Cal.App.3d 632, 642, 252 Cal.Rptr. 434.) As Lugashi explains, although mistakes can occur, "`such matters may be developed on cross-examination and should not affect the admissibility of the [record] itself.' [Citation.]" (Ibid.; see also U.S. v. Catabran (9th Cir. 1988) 836 F.2d 453, 458 [questions "as to the accuracy of [computer] printouts, whether resulting from incorrect data entry or the operation of the computer program, as with inaccuracies in any other *707 type of business records, [affect] only the weight of the printouts, not their admissibility"]; Hutchinson v. State (Tex.Ct.App. 1982) 642 S.W.2d 537, 538 [whether computer was functioning properly on the date of the printout and had been tested and was working properly before that date were questions affecting weight, not admissibility].) Although Lugashi involved admission of bank records under the business records exception to the hearsay rule, rather than government records under the official records exception, defendant offers neither a persuasive reason nor legal precedent for imposing different requirements on admission of government computer records.
Citing articles that he asks us to notice judicially, but that he did not present to either the trial court or the Court of Appeal, defendant asserts that "delays in entering data into systems, and problems that have plagued government computers in general, and several law enforcement programs in particular, would indicate that a blind reliance on their trustworthiness is misplaced." We decline to take judicial notice of these articles. The information they contain does not, in our view, constitute facts or propositions that are of common knowledge or that are not reasonably subject to dispute. (Evid.Code, § 452, subds. (g), (h).) Moreover, none of the articles relate to the computer systems here at issue. At no point during this case has defendant offered any relevant evidence regarding the reliability of those computer systems. (See Mangini v. R.J. Reynolds Tobacco Co. (1994) 7 Cal.4th 1057, 1063, 31 Cal.Rptr.2d 358, 875 P.2d 73 [only relevant material may be judicially noticed].) Indeed, defendant concedes that he neither has offered nor knows of "any definitive studies" questioning "the reliability of the computerized systems of criminal histories used in this case."
In lieu of evidence to support his attack on the trial court's trustworthiness finding, defendant argues the Department itself "has taken a stand questioning the reliability of CLETS." In support of this argument, he cites legislative history for a 1997 enactment that authorized county child welfare agencies to obtain "a criminal record through [CLETS]," but only until "January 1, 2000, or ... an automated mobile and fixed location fingerprint identification system is available and accessible to a child welfare agency, whichever comes first." (Health & Saf.Code, § 1522.06.) According to a summary prepared for a May 6, 1997, hearing before the Senate Committee on Public Safety, "While the [Department] has not taken a position on this bill, their [sic] position in the past has been to oppose measures which would not conform with their [sic] policy of conducting background checks using fingerprints. That policy is based on studies indicating that name checks (as utilized for CLETS), even with social security numbers or driver's license numbers, result in an error rate of around 10%. [¶] Given the potential for error using the system this bill proposes, the [Department] has expressed a concern over their [sic] liability. The [Department] is concerned that someone could rely on the CLETS system to provide accurate information, when the error rate exists, and could then blame the [Department] for the error when a more accurate search could be conducted by fingerprinting the individual." (Sen. Com. on Public Safety, Rep. on Sen. Bill No. 468 (1997-1998 Reg. Sess.) May 6, 1997, p. 5.) And, according to a summary prepared for a July 30, 1997, hearing before the Assembly Committee on Appropriations, "The [Department] generally opposes background checks without fingerprint verification because CLETS name checks result in multiple `hits' based only on name. [¶] The [Department] suggests using the LiveScan automated fingerprint identification system instead of CLETS because of its greater accuracy. This technology, however, is not yet available statewide; [the Department] hopes it will be in 1998. To address this concern, the bill sunsets the CLETS authorization 1/1/00, or when LiveScan is available, whichever comes *708 first." (Assem. Com. on Appropriations, Rep. on Sen. Bill No. 468 (1997-1998 Reg. Sess.) July 30, 1997, p. 1.) Based on "the concerns of the Department ... over the accuracy of CLETS" these summaries reference, defendant argues "that there are sufficient indications as to a lack of trustworthiness [regarding CLETS records] so as to preclude their use as substantive evidence in a criminal trial."[9]
These summaries do not establish that the trial court's trustworthiness finding was an abuse of discretion. Because they did not exist at the time of defendant's trial in 1995, obviously the trial court did not, and could not, consider them. In any event, their attribution to the Department of a concern about "multiple `hits'" would have added little to the information that was already before the trial court. If a problem with "multiple `hits'" exists, then one might question whether a CLETS printout for a particular person might in fact relate to a different person with the same name. However, as we have noted, Helbling testified that he exercised care and caution in obtaining criminal history information relating to Lawrence Martinez because the names "Lawrence" and "Martinez" are both common. As we also have noted, the prosecution presented additional evidence, including Detective Barron's testimony, to tie the CLETS printout in this case to defendant. Nothing in the legislative summaries defendant cites suggests the Department is concerned that a CLETS printout adequately tied to a particular person reports convictions that person did not sustain or prison terms that person did not serve. In this regard, Helbling testified the Department would add information about an incident to a person's criminal history only after verifying the person's identity using fingerprints. Accordingly, the legislative summaries defendant now cites do not establish that the trial court's trustworthiness finding was an abuse of discretion. (See Richmond v. Frederick (1953) 116 Cal.App.2d 541, 550, 253 P.2d 977 [trial court's ruling regarding "the sufficiency of the evidence as to the foundation will not be disturbed if supported by substantial although conflicting evidence"].)
In summary, we conclude on the record before us that the trial court did not abuse its discretion in admitting the CLETS printout under the official records exception to the hearsay rule.

B. Los Angeles County Sheriffs Department Printout (Exhibit 7)

Helbling testified that the Los Angeles County Sheriffs Department had its own computer system, known as the PHI, containing criminal history information relating to proceedings in Los Angeles County. Exhibit 7 was a printout relating to Larry Salvador Martinez, which Helbling generated from the PHI system on the day of his testimony and which included information relating to the subject's birth date and Social Security, CII, FBI, and California driver's license numbers. Helbling explained that, like the Department of Justice, the sheriff would add information about an incident to a person's criminal history only after verifying the person's identity using fingerprints. Helbling also explained that some of the information in exhibit 7 corresponded to information in some of the prosecution's other exhibits. Regarding the prior convictions at issue here, exhibit 7 referred only to October 1986 felony convictions for assault with a deadly weapon and grand theft, for which Larry Salvador Martinez was sent to prison for three years.
In addition to considering Helbling's testimony to determine the admissibility of the PHI printout, the trial court could take judicial notice under Evidence Code section 451, subdivision (a), of the following statutes (some of which we have *709 already discussed) that, from the date of the earliest conviction the printout reports (October 1986) to the present, have imposed obligations on the Los Angeles County Sheriffs Department relating to criminal history information.
1. Section 11107: Since 1978, section 11107 has required each sheriff or police chief executive to furnish to the Department "[d]aily reports" of certain specified misdemeanors and felonies, including "grand theft" and "threats." The required reports must "describe the nature and character of each such crime and note all particular circumstances thereof and include all additional or supplemental data." (§ 11107.)
2. Section 13150: Since July 1, 1978, section 13150 has provided that "[f]or each arrest made, the reporting agency shall report to the Department of Justice, concerning each arrest, the applicable identification and arrest data described in Section 13125 and fingerprints, except as otherwise provided by law or as prescribed by the Department of Justice." The identification and arrest data section 13125 describes includes the offender's name (including aliases and monikers), date of birth, address, Social Security and California driver's license numbers, CII and FBI numbers, booking number, date of arrest, and offenses charged. As we have previously explained, section 13150 became operative in 1978 as part of a new Penal Code chapter relating to criminal offender record information, the first section of which declared: (a) California criminal justice agencies "require, for the performance of their official duties, accurate and reasonably complete criminal offender record information"; (b) "the Legislature and other governmental policymaking or policyresearching bodies, and criminal justice agency management units require greatly improved aggregate information for the performance of their duties"; (c) "policing agencies and courts require speedy access to information concerning all felony and selected misdemeanor arrests and final dispositions of such cases"; (d) "criminal justice agencies may require regular access to detailed criminal histories relating to any felony arrest that is followed by the filing of a complaint"; and (e) to achieve these goals, "the recording, reporting, storage, analysis, and dissemination of criminal offender record information in this state must be made more uniform and efficient, and better controlled and coordinated." (§ 13100.)
3. Section 11115: Since 1978, section 11115 has provided: "In any case in which a sheriff, police department or other law enforcement agency makes an arrest and transmits a report of the arrest to the Department of Justice ..., it shall be the duty of such law enforcement agency to furnish a disposition report to such agencies whenever the arrested person is transferred to the custody of another agency.... The disposition report in such cases shall be furnished to the appropriate agencies within 30 days of release or transfer to another agency."
4. Section 13151: Since 1978, section 13151 has required "[t]he ... court that disposes of a case for which an arrest was required to be reported to the Department of Justice pursuant to Section 13150" to "assure that a disposition report of such case ... is furnished to the Department of Justice within 30 days" and to "furnish a copy of such disposition report to the law enforcement agency having primary jurisdiction to investigate the offense alleged in the complaint or accusation."
5. Section 13300: Since 1978, section 13300, subdivision (b), has required local criminal justice agencies to "furnish local summary criminal history information" to "[t]he subject of the information and to, among others, state courts, peace officers, prosecuting city attorneys, state district attorneys, and public defenders "when needed in the course of their duties." As used in this section, "`Local summary criminal history information' means the master record of information compiled by any local criminal justice agency pursuant *710 to Chapter 2 (commencing with Section 13100) ... pertaining to the identification and criminal history of any person, such as name, date of birth, physical description, dates of arrests, arresting agencies and booking numbers, charges, dispositions, and similar data about the person." (§ 13300, subd. (a)(1).) Section 13300 is also part of the Penal Code chapter on criminal offender record information that became operative in 1978 and included (in § 13100) the legislative findings and declarations we have already set forth.
Given Helbling's testimony and these statutes, the trial court did not abuse its discretion in finding that the PHI printout "was made by and within the scope of duty of a public employee." (Evid.Code, § 1280, subd. (a).) Like the CLETS printout, the PHI printout reports information relating only to California offenses. As we have shown, the Los Angeles County Sheriffs Department had a statutory duty to collect and compile the reported information, to report criminal history information to the Department of Justice, and to furnish the compiled information to specified entities when needed in the course of their duties and to the subject of the information. "It is presumed" these statutory duties were "regularly performed." (Evid.Code, § 664.) Thus, the PHI printout satisfied the first requirement of the official records exception.
The trial court also did not abuse its discretion in concluding the PHI printout met the second requirement of the official records exception, i.e., that it "was made at or near the time of the act, condition, or event." (Evid.Code, § 1280, subd. (b).) Considering the statutory duties we have set forth, in light of the legislative declaration that criminal justice agencies require speedy access to accurate and reasonably complete criminal history information (§ 13100), we conclude the Los Angeles County Sheriffs Department had a duty to record the information reported on the PHI printout within a short period after receiving the information. Again, "[i]t is presumed" this duty was "regularly performed" (Evid.Code, § 664), and defendant offered no evidence to the contrary. Thus, the trial court did not abuse its discretion in concluding that the PHI printout met the second requirement of the official records exception.
Finally, the same factors we have discussed in connection with the CLETS printout establish the trial court did not abuse its discretion in finding that as to the PHI printout, "[t]he sources of information and method and time of preparation were such as to indicate its trustworthiness." (Evid.Code, § 1280, subd. (c).) Helbling's testimony and the relevant statutes established that the sources of information in the PHI printout were public employees who had a duty to observe, report, record, and disseminate the information. "None of the information reflects the opinions or conclusions of the reporting employees." (Dunlap, supra, 18 Cal. App.4th at p. 1479, 23 Cal.Rptr.2d 204.) In establishing these duties, the Legislature stressed the need for "accurate and reasonably complete criminal offender record information" (§ 13100, subd. (a), italics added) and "uniform," "efficient," and "controlled and coordinated" handling of criminal history information. (§ 13100, subd. (e).) As we have explained, these provisions impose "a duty to employ methods ensuring a reasonable level of accuracy and reliability." (Dunlap, supra, 18 Cal. App.4th at p. 1480, 23 Cal.Rptr.2d 204.) And, applying the presumption that "official duty has been regularly performed" (Evid.Code, § 664), the trial court did not abuse its discretion in finding that the Los Angeles County Sheriffs Department complied with its duty. Again, defendant offered no contrary evidence, and Detective Barron's testimony was consistent with the information in the PHI printout. Finally, as it did with CLETS in 1971, in 1979 the Legislature established a statutory mechanism for individuals to review and obtain correction of the criminal history information compiled by local criminal *711 justice agencies such as the Los Angeles County Sheriffs Department. (§§ 13320-13326.) Given all of these considerations, we conclude the trial court did not abuse its discretion in finding that the PHI printout satisfied the third requirement of the official records exception and admitting the printout into evidence.
In light of our conclusion that exhibits 7 and 9 were admissible under the official records exception to the hearsay rule, we need not consider their admissibility under the business records exception (Evid.Code, § 1271).

DISPOSITION
The judgment of the Court of Appeal is affirmed.
GEORGE, C.J., MOSK, J., BAXTER, J., and BROWN, J., concur.
Dissenting Opinion by WERDEGAR, J.
I respectfully dissent. In concluding the computer printouts at issue in this case fall within the official records exception to the hearsay rule (Evid.Code,[1] § 1280), the majority identifies no evidence produced by the proponent of the evidence at trial, here the People, that established the foundational requirement that "[t]he writing was made at or near the time of the act, condition, or event." (§ 1280, subd. (b).) Neither document, therefore, qualified as an official record excepted from the hearsay rule. Accordingly, the trial court erred in admitting both documents into evidence against defendant Martinez.

I
The printout from the California Law Enforcement Telecommunications System (CLETS), which includes a computer database maintained by the State Department of Justice (Department), purports to be an accurate record of defendant's prior felony convictions. The People offered it to prove the prior felony conviction enhancement allegations charged against defendant. As such, the CLETS printout was hearsay, i.e., it was "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (§ 1200, subd. (a).) Although hearsay evidence is inadmissible unless it comes within a recognized exception, the majority finds section 1280, the official records exception, applicable. That section provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applty]: [¶] (a) The writing was made by and within the scope of duty of a public employee. [¶] (b) The writing was made at or near the time of the act, condition, or event. [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness."[2]
The critical question in this case concerns the second of the statutory requirements: was the writing "made at or near the time of the act, condition, or event"?[3] This requirement is important: requiring a public employee to write something down as part of his or her official duty, and to do *712 so close in time to the actual event, supplies a degree of trustworthiness for the information that would otherwise be absent. In his treatise on the law of evidence, Justice Jefferson, speaking of the identical timeliness requirement in section 1271, the business records hearsay exception, explained: "Prompt recording after an event is required to ensure accuracy of recollection and recording.... The timeliness of the entry as a requirement ... is also emphasized by the additional requirement that the court must find that ... the `time of preparation' of the writing was such as to indicate trustworthiness. If a writing is made long after the act or event recorded, it cannot be considered as complying with either of these requirements." (1 Jefferson, Cal. Evidence Benchbook (3d ed. 1998) § 4.8, p. 114.)
Because all three requirements in section 1280 must be met, failure to satisfy even one will take the CLETS computer printout outside the scope of the hearsay exception for official records. Although on appeal we apply the abuse of discretion standard when reviewing a trial court's decision that evidence falls within a hearsay exception (People v. Jones (1998) 17 Cal.4th 279, 308, 70 Cal.Rptr.2d 793, 949 P.2d 890), a trial court's exercise of such discretion must be based on evidence and not on whim or caprice (see 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 358, pp. 406-408 [explaining the "Limits of Legal Discretion"]). It is in this respect that I part company with the majority, for I find no evidence the information in the CLETS computer printout was written "at or near the time of the act, condition, or event," here, defendant's prior felony convictions.
To satisfy the requirement the writing be made "at or near the time of the ... event," the majority relies on a number of statutes. These statutes, according to the majority, require law enforcement agencies to report conviction information to the Department in a timely manner and the Department, upon request, to provide such criminal history information to law enforcement agencies. In addition, according to the majority, these statutes set forth a legislative "purpose" (maj. opn., ante, 91 Cal.Rptr.2d at p. 703, 990 P.2d at p. 578) that the Department create and maintain a database that will enable it to have "`speedy access'" to "`accurate and reasonably complete criminal offender record information.'" (Ibid., quoting Pen.Code, § 13100, subds. (a), (c).) From these premises, the majority concludes the Department has a statutory "duty" to record conviction information it receives into the CLETS computer database "`within a short period of its receipt from the reporting agency.'" (Maj. opn., ante, 91 Cal. Rptr.2d at p. 703, 990 P.2d at p. 578, italics added, quoting People v. Dunlap (1993) 18 Cal.App.4th 1468, 1479, 23 Cal.Rptr.2d 204.) Then, having discerned such a statutory "duty," the majority invokes section 664's evidentiary presumption that an official dutythe asserted duty to record the conviction information within a short time of receiving ithas been regularly performed.
The majority's reasoning falters at the threshold, for its premises are unsound. Simply put, the several statutes on which the majority relies fail, both individually and collectively, to establish any "duty" on the part of the Department to enter conviction information into the CLETS computer database within a short time after receiving it. First, although the statutes on which the majority relies admittedly create a duty requiring law enforcement agencies timely to notify the Departmentsometimes daily (Pen.Code, § 11107), sometimes within 30 days (Pen. Code, § 13151; see also Pen.Code, former § 11117 [Stats.1972, ch. 1377, § 86, p. 2841])of information concerning arrests, convictions and dispositions, none of these statutorily imposed "duties" speaks to when the Department must then record that information into the CLETS computer database. It could be hours, days, weeks, or even months later.
*713 Second, that the Department must, by law, respond to a request for information within 72 hours of receiving it, is irrelevant. (Pen.Code, §§ 13175, 13176.) The rules regarding time of access (i.e., retrieving and disseminating information) have little to do with when the information must first be recorded into the CLETS computer database. For example, the Department would be in full compliance with Penal Code sections 13175 and 13176 if it waited several weeks before recording conviction information into the database, so long as it responded to requests for information within the 72-hour time limit.
Third, the Legislature's stated "purpose" in authorizing creation of the CLETS computer system similarly fails to create a "duty" of a writing close in time to the conviction. Although the Legislature has declared the Department should create a computer database of criminal conviction information because law enforcement agencies require "accurate and reasonably complete criminal offender record information" (Pen.Code, § 13100) and need "speedy access" to such information (ibid.), and that the CLETS system be "established and maintained in a condition adequate to the needs of law enforcement" (Gov.Code, § 15151), these generally stated goals fail to impose on the Department an official "duty" to record the conviction information within a short time after receipt. For example, a court disposing of a case may forward that information to the Department within 30 days (Pen.Code, § 13151), and the Department might wait, for example, 60 additional days before recording that information into the CLETS computer database. One could reasonably conclude this procedure would result in a database that is "accurate and reasonably complete" (Pen.Code, § 13100) and yet still conclude the writing, made a full 90 days after the event, was not made "at or near the time of the ... event" as required by section 1280, subdivision (b).[4] In short, the Legislature's "purpose" in authorizing creation of the CLETS system, even considered together with its stated aspirations for the utility of that system, is simply too vague to permit the conclusion that these statutes imposed on the Department a legal "duty" to record conviction information "near the time" of the conviction.
Accordingly, none of the statutes addressing (1) the obligation of law enforcement agencies to report conviction information to the Department, (2) the obligation of the Department to respond within 72 hours to requests for information, or (3) the Legislature's intention the CLETS system be an "accurate and reasonably complete" repository of "criminal offender record information" (Pen.Code, § 13100) establish an official "duty" on the part of the Department to record conviction information into the CLETS computer database within a short time after it receives that information from other law enforcement agencies.[5] *714 That being so, the presumption of an official duty regularly performed, set forth in section 664, does not apply.
The majority's line of reasoning is similar to that applied in People v. Dunlap, supra, 18 Cal.App.4th 1468, 23 Cal.Rptr.2d 204 (Dunlap), which it cites but does not discuss in depth. The Court of Appeal in Dunlap faced the same question we decide today: whether a CLETS computer printout was admissible under section 1280. The Dunlap court held in the affirmative: "Nothing in the statutory provisions expressly directs the Department of Justice to record information received from reporting agencies within any particular time period. However, a duty to record the information within a short period after its receipt can be reasonably inferred. The entire statutory scheme for recording and reporting criminal offender record information was enacted in light of legislative findings and declarations, including `[t]hat policing agencies and courts require speedy access to information concerning all felony and selected misdemeanor arrests and final dispositions of such cases.' ([PemCode,] § 13100, subd. (c), italics added.) [Penal Code s]ections 13175 and 13176 require the Department of Justice to furnish information within 72 hours of a request therefor. Unless the Department of Justice records information from reporting agencies promptly, it will not be in [a] position to furnish complete information within the 72-hour period. [¶] In light of the statutory purpose and objective, and the 72-hour provisions in [Penal Code] sections 13175 and 13176, we conclude that the Department of Justice had a duty to record information as to each event shown on appellant's rap sheet within a short period of its receipt from the reporting agency. The presumption that duty was regularly performed supports the trial court's implied finding that the Department of Justice recorded the information at or near the time of the recorded event." (Dunlap, supra, at p. 1479, 23 Cal.Rptr.2d 204.)
Like the majority, the Dunlap court fails to explain why requiring the Department to respond to requests for information within 72 hours has any effect on the time the Department must first enter the received information into the CLETS computer database. Penal Code section 13100 does not, as the Dunlap court inferred, require the Department to respond to a request with complete, up-to-the-minute information. Instead, that section merely recites a legislative finding that law enforcement agencies need "accurate and reasonably complete criminal offender record information" (Pen.Code, § 13100, subd. (a)) and that the "recording, reporting, storage, analysis, and dissemination of criminal offender record information in this state must be made more uniform and efficient ..." (id., subd. (e)). Contrary to the conclusion of the Dunlap court (a conclusion the majority also draws), the law imposes no legal duty on the Department to record conviction information within 72 hoursor any other "short period"of receipt. (Dunlap, supra, 18 Cal.App.4th at p. 1479, 23 Cal.Rptr.2d 204.)
This flaw in Dunlap's reasoning was recognized by Justice Jefferson in his treatise on evidence law. He writes: "With regard to the second requirement of [Evidence Code] § 1280, the Dunlap court was quick to draw the conclusion that the entries on the rap sheet were made at or near the time of the act, condition, or event, as required by [Evidence Code] § 1280, based on inferences that the appellate court drew from statutes concerning the recording and reporting of a person's criminal history. The court glossed over the fact that there is no statutory requirement that the Department of Justice record *715 information received from reporting agencies within any particular time period." (1 Jefferson, Cal. Evidence Benchbook, supra, § 5.11, p. 135, italics added.)
Nor is the majority's result saved by its observation that the conviction information to be recorded into the CLETS computer database "does not depend on memory, but simply involves a transfer of information from one form of storagethe disposition reportsto anotherthe CLETS database." (Maj. opn., ante, 91 Cal.Rptr.2d at p. 703, 990 P.2d at p. 578.) To begin with, the majority cites no California authority supporting its novel view that section 1280, subdivision (b)'s requirement the writing be made "at or near the time of the act, condition, or event" (italics added) may be satisfied by a writing made remote in time, so long as the circumstances of the writing indicate its overall trustworthiness.[6] (Cf. § 1280, subd. (c) [setting forth a separate requirement conditioning admissibility on a showing that the "sources of information and method and time of preparation [of the evidence] were such as to indicate its trustworthiness" (italics added)].)
The lack of any state authority for this line of reasoning aside, that the conviction information is not recorded into the CLETS computer database from memory is simply not relevant to the temporal inquiry required by section 1280, subdivision (b). That is, even were we to conclude the method of recording (moving transcribed information from one written form to another) indicates an acceptable level of trustworthiness, that conclusion still tells us nothing about when the writing was made. Without such information, we cannot conclude the evidence satisfies the requirement the writing be made "at or near the time of the act, condition, or event." (§ 1280, subd. (b).)
There being no evidence to support the trial court's finding the writing, as evidenced by the CLETS computer printout (see ante, 91 Cal.Rptr.2d p. 711, fn. 3, 990 P.2d p. 586, fn. 3), was made "at or near the time of the act, condition, or event" (§ 1280, subd. (b)), I conclude the trial court abused its discretion in ruling the CLETS computer printout was an official record excepted from the hearsay rule.

II
The People also attempted to prove defendant's prior convictions by introducing a computer printout from the Personal History Index (PHI), a computer database maintained by the Los Angeles County Sheriffs Department. The majority's rationale for concluding the trial court did not abuse its discretion in admitting the PHI computer printout is flimsier even than its reasoning with respect to the CLETS printout. None of the statutes identified by the majority speak to when the sheriffs department must enter conviction information into its own computer database, a database the Legislature does not require the sheriffs department to maintain. I suspect the sheriffs department would be surprised to learn that Penal Code section 13100 imposes on it a legal duty to record conviction information within 72 hours of a criminal defendant's conviction.
There being no duty to record the information into the PHI database near the time of the conviction, no presumption can arise of an official duty regularly performed. It follows the trial court had before it no evidence from which it could have concluded the PHI computer printout was written "at or near the time of the ... [conviction]"; the court thus abused its discretion by so finding.

III
By approving the trial court's evidentiary ruling in this case, the majority provides an unwarranted shortcut around a statutorily authorized, specific and convenient *716 method of proving a criminal offender's prior felony convictions. Penal Code section 969b sets forth what is essentially a special official records hearsay exception applicable to the proof of prior convictions in criminal cases. It provides that to prove prior felony convictions or service of prison terms, "the records or copies of records of any state penitentiary, reformatory, county jail, city jail, or federal penitentiary in which such person has been imprisoned, when such records or copies thereof have been certified by the official custodian of such records, may be introduced as such evidence." (Pen.Code, § 969b.) Use of such records, while not the sole manner of proof available to the People, is the "common method of proof in such situations (see 3 Witkin & Epstein, Cal.Criminal Law (2d ed. 1989) Punishment for Crime, § 1528, p. 1822) and provides an easy and effective way to prove an offender's prior felony convictions.
We should not be so sanguine about the accuracy of a computer's output. Indeed, as the majority admits, the Department has, in another context, expressed concern over the accuracy of the CLETS computer system absent some way to pair it with a fingerprint identification system. The Department's finding that searching its CLETS database using names paired with either Social Security numbers or driver's license numbers still resulted in an error rate of 10 percent (maj. opn., ante, 91 Cal.Rptr.2d at p. 707, 990 P.2d at p. 582), is disturbing. Relying on a document from a system with such an error rate is certainly an unacceptable basis for a sentence that, in this case, will run the rest of this defendant's natural life.
It takes no great imagination to see how inaccuracies in the CLETS database can harm a typical criminal defendant. A number of things can occur following a felony conviction that can operate to eliminate the conviction, including deferring entry of judgment pending successful completion of counseling for child abuse or neglect (Pen.Code, § 1000.12) or of a drug diversion program (id., § 1000 et seq.), or reversal of the conviction on appeal. Delay in recording information relating to postconviction events could result in a printout from the CLETS database that erroneously shows the defendant as having suffered a felony conviction, rendering the defendant vulnerable to an improperly enhanced sentence.
Turning one last time to the views of Justice Jefferson: "Law enforcement has numerous resources. The courts should not be put in the position of having to infer all of the requirements for admission of a rap sheet from statutory presumptions and judicial notice. Rap sheets are generally inferior to court and prison records, and should be subjected to greater scrutiny than were the records in Dunlap." (1 Jefferson, Cal. Evidence Benchbook, supra, § 5.11, p. 135.)
I would reverse the decision of the Court of Appeal.
KENNARD, J., concurs.
NOTES
[1] Unless otherwise indicated, all further statutory references are to the Penal Code.
[2] In the remainder of this opinion, we will refer to the Department of Justice as the Department unless the full designation is necessary for clarity.
[3] Consistent with the evidence, the court found defendant sustained the fourth conviction in 1986, not in 1988 as the information alleged. Defendant does not complain about this discrepancy.
[4] We reach the same conclusion regarding the other statutes that defendant argues evince the Legislature's intent to exclude CLETS records as evidence of his criminal history. (See Evid.Code, § 1560; former Evid.Code, § 1500.5; former Veh.Code, § 23200, subd. (b).)
[5] Defendant incorrectly asserts that the Legislature authorized CLETS by enacting section 11105 in 1975.
[6] Because all of the information in the CLETS printout admitted in this case relates to California convictions, we consider only the duties of relevant California public employees. We express no opinion regarding the admissibility of information relating to offenses committed in other jurisdictions, which would depend in part on the duties of public employees from those other jurisdictions.
[7] The dissent complains that we cite "no California authority" for our analysis regarding application of the timeliness requirement to simple transfers of information like those involved here. (Dis. opn. of Werdegar, J., post, 91 Cal.Rptr.2d at p. 715, 990 P.2d at p. 589.) However, on this issue, the dissent cites no decisional authority at all, from California or otherwise, and, without analysis, dismisses out of hand the decisions we cite simply because they are not from California. Moreover, we do not, as the dissent asserts, hold that the timeliness requirement "may be satisfied by a writing made remote in time, so long as the circumstances of the writing indicate its overall trustworthiness." (Dis. opn. of Werdegar, J., post, 91 Cal.Rptr.2d at p. 715, 990 P.2d at p. 589, original italics, fn. omitted.) Rather, we hold that, in light of the relevant statutes and facts, the trial court did not abuse its discretion in finding that the CLETS record satisfied the "at or near the time" requirement of Evidence Code section 1280. Indeed, the dissent answers the wrong question in reasoning that "[o]ne could reasonably conclude" a writing "made a full 90 days after the event" is accurate and reasonably complete "yet still conclude" it "was not made `at or near the time of the event.'" (Dis. opn. of Werdegar, J., post, 91 Cal.Rptr.2d at p. 715, 990 P.2d at p. 589.) As explained in Justice Jefferson's treatise on California evidence law, which is the authority on which the dissent principally relies: "How soon a writing must be made after the act or event is a matter of degree and calls for the exercise of reasonable judgment on the part of the trial judge." (1 Jefferson, Cal. Evidence Benchbook (3d ed.1998) § 4.8, pp. 114-115, italics added.) Thus, the question before us is whether, under the circumstances, the trial court here reasonably concluded (i.e., did not abuse its discretion in finding) that the record was made at or near the time of the event. (People v. Jones (1998) 17 Cal.4th 279, 308, 70 Cal.Rptr.2d 793, 949 P.2d 890.) It is not, as the dissent apparently believes, whether "[o]ne could reasonably conclude" otherwise. (Dis. opn., post, 91 Cal.Rptr.2d at p. 715, 990 P.2d at p. 589.)

Nor does the dissent's discussion of hypothetical "postconviction events" (Dis. opn., post, 91 Cal.Rptr.2d at p. 716, 990 P.2d at p. 590) persuasively explain why even its hypothetical 90-day recording delay renders admission of the CLETS record an abuse of the trial court's discretion. The prosecution offered the CLETS record to establish that defendant Larry Salvador Martinez was the Larry or Lawrence Martinez who was the subject of the superior court case files and certified prison records the prosecution introduced. As to this issue, the postconviction events the dissent cites would be irrelevant. In any event, an objection that a record is "incomplete" generally "go[es] to the weight of th[e] evidence and not its admissibility. [Citations.]" (Matador Drilling Co., Inc. v. Post (5th Cir. 1981) 662 F.2d 1190, 1199; see also U.S. v. Scholl (9th Cir.1999) 166 F.3d 964, 978; U.S. v. Nivica (1st Cir. 1989) 887 F.2d 1110, 1125-1126; United States v. Moore (7th Cir. 1986) 791 F.2d 566, 575, fn. 7; Pryor v. United States (D.C.1986) 503 A.2d 678, 679; Wallace by Wallace v. Target Stores, Inc. (Colo.Ct.App.1985) 701 P.2d 1272, 1273; 29A Am.Jur.2d (rev.) Evidence, § 1314, p. 721.) Moreover, nothing prevents a defendant from presenting evidence of a relevant postconviction event. Here, defendant has never even alleged that any such postconviction event occurred. Of course, a record's failure to report a recent conviction would be to a defendant's benefit.
[8] As Fisk explained, "the essential `circumstantial probability of trustworthiness' justifying the common law exception to the hearsay rule for official statements `is related in its thought to the presumption that public officers do their duty. When it is a part of the duty of a public officer to make a statement as to a fact coming within his official cognizance, the great probability is that he does his duty and makes a correct statement.... The fundamental circumstance is that an official duty exists to make an accurate statement, and that this special and weighty duty will usually suffice as a motive to incite the officer to its fulfillment. The duty may or may not be one for whose violation a penalty is expressly prescribed.... It is the influence of the official duty, broadly considered, which is taken as the sufficient element of trustworthiness, justifying the acceptance of the hearsay statement.' [Citation.]" (Fisk, supra, 127 Cal.App.3d at pp. 78-79, 179 Cal.Rptr. 379, italics in original.)
[9] We grant defendant's unopposed request that we take judicial notice of these legislative materials.
[1] All statutory references are to the Evidence Code unless otherwise stated.
[2] This is the version of section 1280 as amended in 1996. (Stats. 1996, ch. 642, § 4.) Although defendant committed his crimes in 1994, and was tried in 1995, I agree with the majority that the 1996 statutory amendment "did not, as defendant suggests, alter the section's substance or meaning." (Maj. opn., ante, 91 Cal.Rptr.2d at p. 701, 990 P.2d at p. 577.)
[3] I agree with the majority that the "writing" to which section 1280 refers in this context means the initial entry of the conviction information into the computer database, not the retrieval and printing of the information from the database. (Maj. opn., ante, 91 Cal. Rptr.2d at pp. 701-702, 990 P.2d at pp. 577-578; see Aguimatang v. California State Lottery (1991) 234 Cal.App.3d 769, 798, 286 Cal. Rptr. 57.)
[4] With these conclusions, I do not, as the majority supposes, "answer[] the wrong question." (Maj. opn., ante, 91 Cal.Rptr.2d at p. 703, fn. 7, 990 P.2d at p. 579, fn. 7.) I merely pose a hypothetical example to illustrate that the Legislature's intention a database of criminal offender record information be created that is "accurate and reasonably complete" is not the same thing as the Legislature imposing a statutory duty on the Department to enter conviction information into the CLETS database "at or near the time of the [conviction]." As noted earlier in this dissenting opinion, I apply the proper standard, namely, whether the trial court abused its discretion. I simply conclude the proponent of the CLETS computer printout failed to present any evidence demonstrating that the information in the printout was written "at or near the time of the ... event[s]" the printout purported to prove, namely, defendant's prior felony convictions. Lacking such evidence, the trial court's ruling the printout fell within section 1280's hearsay exception was an abuse of discretion.
[5] The majority apparently recognizes the problem, stating that "[t]he statutes are less specific regarding the Department's duty to enter the criminal information it receives into the CLETS database." (Maj. opn., ante, 91 Cal.Rptr.2d at p. 702, 990 P.2d at p. 577, italics added.) Indeed, the statutes are so lacking in specificity that I can find no obligation at all requiring the Department to enter conviction information at any particular time. If the Department were to fail to enter conviction information into the CLETS computer database for several months after receiving it, the most one could say would be the Department was not fulfilling the Legislature's expectations. Had the Legislature intended to impose on the Department a time limit for entering conviction data into the CLETS computer database, it certainly knew how to do that.
[6] If this is not the logical effect of the majority's reliance on the fact that the information is not recorded into the CLETS computer database from memory (see maj. opn., ante, 91 Cal.Rptr.2d p. 703, 990 P.2d p. 578), it is unclear to me what significance the majority places on this factor at all.