[No. D008848. Fourth Dist., Div. One. Oct. 19, 1989.]

In re CURTIS T., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
CURTIS T., Defendant and Appellant.

**COUNSEL**

Charles R. Khoury, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Lilia E. Garcia and Roy W. Hewitt, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**KREMER, P. J.**—Curtis T. admitted an allegation he possessed stereo equipment with obliterated serial numbers in violation of Penal Code section 537e and was declared a ward of the court. (Welf. & Inst. Code,[1] § 602.) On appeal, Curtis contends the court erred in denying his suppression motion.

FACTS

On May 3, 1988, a petition was filed alleging Curtis had unlawfully possessed cocaine. He was placed on home supervision pursuant to a home supervision agreement signed by Curtis and his mother. On Friday, May 13, 1989, Assistant Deputy Probation Officer Charlotte Welch, who was assigned to the home supervision detail, called Curtis's home and asked to speak with him. She spoke to his mother who told her Curtis was not at home. This violated the terms of Curtis's home supervision agreement. Welch stated she would come by the following morning to pick up Curtis and take him to juvenile hall for violating his home supervision.

At about 9 a.m. Saturday morning, Welch and another probation officer accompanied by La Mesa Police Officer Ozeroff and his partner went to Curtis's house to arrest him for violating the conditions of his home supervision. The police officers initially attempted to locate the window to Curtis's bedroom in case he should attempt to flee but were unable to do so. All four officers went to the front door.

Curtis's mother answered the door and invited the officers into the living room. The mother and Officer Ozeroff testified that once inside the house, the mother said she would be back out with Curtis in a moment. The mother testified several times she specifically asked the officers to wait in the living room for her to awaken Curtis and bring him from his bedroom into the living room. Officer Ozeroff testified he told the mother he wanted to go with her because he was afraid Curtis might flee. The mother, after opening the door to the bedroom, stepped aside, letting the officers enter first. She testified she felt she had no choice but to let the officers enter the room.

In contrast to the testimony of the mother and Officer Ozeroff, Probation Officer Welch testified the mother never asked the officers to wait, but instead, after explaining Curtis was in the bedroom, she turned toward the bedroom and said "this way," indicating they should follow.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

Once in the bedroom, Officer Ozeroff noticed some car stereo equipment piled on the floor. It struck him as unusual to have so much equipment in one place. He also noticed the wires on an AM/FM car radio had been cut. The manner in which the wires had been cut, all to the same length, and his past experience led Officer Ozeroff to believe the stereo had been stolen from a car. Accordingly, Officer Ozeroff picked up the stereo to check the serial number and run a computer check on it. The serial number, however, had been obliterated. He then examined two other pieces of stereo equipment for serial numbers and found another obliterated serial number. The serial number on the last item was intact and the item had not been reported stolen.

Curtis moved to suppress the evidence, contending the officers had no right to enter his bedroom and no right to search the stereo equipment. He presented evidence his mother had told the officers to wait in the living room, that the stereo equipment had been covered with towels at the time the officers entered the room and that his mother had protested Officer Ozeroff's lack of a search warrant when Ozeroff picked up the car radio to examine it. Curtis also contended the condition of his home supervision stating the probation officer "shall have access to the minor and the minor's school attendance records at all times" did not justify the officers' intrusion into the bedroom.

The trial court denied the suppression motion. Immediately following the court's denial of his suppression motion, Curtis admitted the allegation of the petition.

### DISCUSSION

### I

■ Curtis contends the home supervision condition, stating the probation officer "shall have access to the minor . . . at all times" did not justify the officers' entry into his bedroom nor act as a waiver to his or his parents' expectation of privacy.

Home supervision is ". . . a program in which persons who would otherwise be detained in the juvenile hall are permitted to remain in their homes pending court disposition of their cases, under the supervision of a deputy probation officer, probation aid, or probation volunteer." (§ 840.) As a condition of home supervision, the minor is required to sign a written promise that he understands and will observe specific conditions of home supervision release. (§ 628.1.) If the minor violates one of the specified conditions of home supervision release contained in his written promise to

obey, then he may be taken into custody and placed in secure detention, subject to court review at a detention hearing. (*Ibid.*) The minor, while on home supervision, is "entitled to the same legal protections as a minor in secure detention, including a detention hearing." (*Ibid.*) A probation officer, aide, community worker or volunteer is assigned to the minor "to assure that the minor obeys the conditions of his release and commits no public offenses pending final disposition of his case." (§ 841.)

In arguing the "access" condition of home supervision authorized the officers' entry into Curtis's bedroom, the Attorney General argues the situation here is similar to a search conducted pursuant to a condition of probation or parole. It is true, the home supervision program has some similarity to probation and parole, in the sense that the minor's release to home supervision (rather than detention in a secure facility) is conditional, but there are also some important differences. In the probation and parole cases cited by the Attorney General, the defendants expressly consented to searches of their person, cars, homes and property without a warrant. (See *People* v. *Brown* (1987) 191 Cal.App.3d 761, 766-767 [236 Cal.Rptr. 506], cert. den. 485 U.S. 907 [99 L.Ed.2d 239, 108 S.Ct. 1080]; *People* v. *Montenegro* (1985) 173 Cal.App.3d 983, 986-987 [219 Cal.Rptr. 331].)[2] In contrast, here, the condition does not specifically authorize a search of Curtis's house; instead it refers only to allowing the probation officer "access to the minor."

In construing the scope of this condition, we find instructive the Supreme Court's analysis in *People* v. *Bravo* (1987) 43 Cal.3d 600 [238 Cal.Rptr. 282, 738 P.2d 336], certiorari denied 485 U.S. 904 [99 L.Ed.2d 234, 108 S.Ct. 1074]. In the *Bravo* case, the Supreme Court rejected an argument a probation condition waiving Fourth Amendment protections should be narrowly construed. The court noted the cases apply a strict standard to waivers of constitutional rights generally (see, e.g., *Johnson* v. *Zerbst* (1938) 304 U.S. 458 [82 L.Ed. 1461, 58 S.Ct. 1019, 146 A.L.R. 357], rejecting implied waivers and requiring a waiver be both knowing and intelligent) but do not strictly construe waivers of Fourth Amendment protection, e.g., consent to searches. The *Bravo* court looked to the United States Supreme Court's decision in *Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218 [36 L.Ed.2d 854, 93 S.Ct. 2041] where the Supreme Court stated: "There is a vast difference

---

[2] In *People* v. *Brown, supra,* 191 Cal.App.3d 761, 765, footnote 2, the probation order required the defendant to " '[p]ermit the search of his person, car, personal effects, or place of residence, night or day, without the necessity of a search warrant, at the direction of the Probation Officer or any peace officer.' "

In *People* v. *Montenegro, supra,* 173 Cal.App.3d 983, 986, the defendant, upon his release from prison, signed a "Notice and Conditions of Parole" form which provided: " 'You and your residence and any property under your control may be searched without a warrant by any agent of the Department of Corrections or any law enforcement officer.' "

between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment. Nothing, either in the purposes behind requiring a 'knowing' and 'intelligent' waiver of trial rights, or in the practical application of such a requirement suggests that it ought to be extended to the constitutional guarantee against unreasonable searches and seizures.

"A strict standard of waiver has been applied to those rights guaranteed to a criminal defendant to insure that he will be accorded the greatest possible opportunity to utilize every facet of the constitutional model of a fair criminal trial. Any trial conducted in derogation of that model leaves open the possibility that the trial reached an unfair result precisely because all the protections specified in the Constitution were not provided. . . .

"The protections of the Fourth Amendment are of a wholly different order, and have nothing whatever to do with promoting the fair ascertainment of truth at a criminal trial. . . . The guarantees of the Fourth Amendment stand 'as a protection of quite different constitutional values— values reflecting the concern of our society for the right of each individual to be let alone. . . .' [Citation.] [¶] Nor can it even be said that a search, as opposed to an eventual trial, is somehow 'unfair' if a person consents to a search. . . . And, unlike those constitutional guarantees that protect a defendant at trial, it cannot be said every reasonable presumption ought to be indulged against voluntary relinquishment." (412 U.S. at pp. 241-243 [36 L.Ed.2d at pp. 871-872].)

Our Supreme Court, in the *Bravo* case, concluded: "[T]he reasoning of *Schneckloth* leads us to conclude that the strict test of waiver of *Johnson* v. *Zerbst* and principles of narrow construction have no application in determining the scope of appellant's consent to search given as a condition to the grant of probation. Rather, appellant's waiver of his Fourth Amendment rights must be interpreted on the basis of an objective test. Law enforcement officers who rely on search conditions in probation orders, the probationer himself, and other judges who may be called upon to determine the lawfulness of a search, must be able to determine the scope of the condition by reference to the probation order. We cannot expect police officers and probation agents who undertake searches pursuant to a search condition of a probation agreement to do more than give the condition the meaning that would appear to a reasonable, objective reader. They can neither inquire into the subjective understanding of the probationer, nor analyze the condition in light of legal precedent drawing fine points based on minor differences in the wording of search conditions in other probation orders. The search condition must therefore be interpreted on the basis of what a reasonable person would understand from the language of the condition itself, not on the basis of appellant's subjective understanding, or under a

strict test in which a presumption against waiver is applied." (*People* v. *Bravo, supra,* 43 Cal.3d 600, 606-607, fn. omitted.)

Like the search condition involved in the *Bravo* case, the access condition involved here implicates Fourth Amendment concerns. Accordingly, we believe the objective test delineated in the *Bravo* case applies here rather than a strict scrutiny test. We conclude a reasonable person would understand the language of the access condition to permit the entry into Curtis's bedroom.

The purpose of the access condition is to ensure the minor complies with his written promises. Since the home supervision agreement contemplates the minor will be at home (unless he is at another permitted location such as a school or place of employment), the probation officer in charge of the home supervision must necessarily have access to the minor in his home. Reasonably, this access would extend to the place in the home normally occupied by the minor, i.e., his bedroom.

Curtis contends the condition required only that he present himself upon demand to the probation officer or that his parents produce him upon request. The condition Curtis and his parents agreed to, however, does not state Curtis must "present" himself upon request, or that his mother must "produce" him on request; the condition states the probation officer "shall have access to the minor . . . at all times." Reasonably interpreted, this language means the probation officer has a right of immediate access and does not have to wait for him to present himself or for the parents to produce him. Curtis gives the condition an unduly strict interpretation.

Curtis also argues the condition in the home supervision agreement, which was signed by his mother, failed to waive his parents' expectations of privacy in their home because "to make it an effective [waiver], they had to be informed what they were giving up." As explained previously, the Supreme Court, however, has made it clear that a strict and formal waiver of Fourth Amendment rights is not required as a prerequisite in obtaining consent to allow a search.

We conclude the officers' entry into Curtis's bedroom was authorized by the access condition of his home supervision agreement.[3]

---

[3] The Attorney General also argues the entry was justified by consent to enter given by the mother. The Attorney General acknowledges there was a conflict in the evidence below (i.e., whether the mother asked the officers to wait in the living room or invited them to follow her to Curtis's bedroom) and concedes the trial court did not base its ruling on this ground but argues we should reject the evidence the mother did not consent because the court disbelieved the mother on another point. In other words, the Attorney General asks us to weigh the evi-

## II

Curtis contends the trial court erred in finding Ozeroff had probable cause to believe the car stereo with the clipped wires was stolen. He argues Ozeroff's testimony that the cut wires were "consistent with" the stereo being stolen from a vehicle and Ozeroff's testimony he formed an opinion "there was a good chance that that particular stereo was stolen based on the way the wires were clipped" did not establish probable cause. Curtis asserts: ". . . Officer Ozeroff's statement there was a good chance the stereo was stolen is the same or less than the 'reasonable suspicion' which existed in *Arizona* v. *Hicks, supra.*"

*Arizona* v. *Hicks* (1987) 480 U.S. 321 [94 L.Ed.2d 347, 107 S.Ct. 1149] is factually distinguishable. In *Arizona* v. *Hicks,* the state conceded the officer lacked probable cause to search stereo equipment for serial numbers. The state conceded the officer had only a " 'reasonable suspicion' " the equipment was stolen. (*Id*. at p. 326 [94 L.Ed.2d at p. 355].) The issue before the United States Supreme Court was whether a reasonable suspicion was sufficient to invoke the plain view doctrine. (*Ibid*.) The court specifically stated the state's concession as to the lack of probable cause precluded the court from considering whether the probable cause standard had been satisfied. (*Id.,* fn. at p. 326 [94 L.Ed.2d at p. 355].) Here, in contrast, there was no such concession by the People.

Further, the facts of *Arizona* v. *Hicks* differ from the facts present here. In *Arizona* v. *Hicks,* the officer's search was based entirely on his opinion that two sets of expensive stereo components seemed out of place in the rather squalid apartment. Here, in contrast, the officer also observed that the wires of the car stereo had been cut.

Curtis contends the officer's testimony he believed there was "a good chance" the equipment had been stolen based on the cut wires which were consistent with a theft establish the officer had only a suspicion the equipment was stolen. We disagree. The phrase "a good chance" can be interpreted to mean that the officer thought it more likely than not that the equipment was stolen, i.e., that he had more than a mere suspicion, he had probable cause. The trial court, after observing this witness, adopted the latter interpretation since it found probable cause existed to support the search. Its determination is supported by the record.

No reversal is merited on this ground.

dence and to judge the credibility of witnesses in a way the trial court might have done but did not, in fact, do. This we may not do.

## DISPOSITION

The judgment is affirmed.

Work, J., and Todd, J., concurred.

A petition for a rehearing was denied November 7, 1989, and appellant's petition for review by the Supreme Court was denied January 18, 1990.