Filed 3/3/15  P. v. Quinones CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LOUIS JOHN QUINONES,<br><br>    Defendant and Appellant. | E058882<br><br>(Super.Ct.No. RIF1106224)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Larrie R. Brainard, Judge. (Retired judge of the San Diego Super. Ct., assigned by the Chief Justice pursuant to art. VI, § 6, of the Cal. Const.)  Affirmed.

Jill M. Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Randall D. Einhorn, and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

1

I

INTRODUCTION

Defendant Louis John Quinones appeals from judgment entered following a jury conviction for possessing heroin for sale (Health & Saf. Code, § 11351).  In a bifurcated trial, the trial court also found true the enhancement allegations that defendant suffered a prior conviction in 2004 (Health & Saf. Code, § 11370.2); a prior prison term (Pen. Code, § 667.5, subd. (b))[1]; and a prior serious or violent felony conviction (§§ 667, subd. (e)(1)).  The trial court sentenced defendant to an aggregate term of seven years in state prison.

Defendant contends his trial attorney committed ineffective assistance of counsel (IAC) by (1) failing to object to expert opinion testimony on whether defendant possessed heroin for sale; (2) stipulating to allowing the prosecution to search his two cell phones and photograph text messages found on the phones; and (3) failing to object to the prosecution introducing into evidence the California Law Enforcement Telecommunication Systems (CLETS) report.  In addition, defendant argues the trial court committed prejudicial error by failing sua sponte to give the jury CALCRIM No. 225, and abused its discretion in denying defendant's motion to strike his 2004 prior felony conviction under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero* motion).  Finally, defendant contends cumulative error supports reversal of his convictions.  We reject defendant's contentions and affirm the judgment.

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

II

FACTS

While on patrol around 3:00 p.m. on December 26, 2011, sheriff's department investigator Jerry Abbott and deputy John Carroll noticed three men sitting on the ground by a tree, near the roadway. Abbott parked his patrol vehicle nearby and the two officers walked towards the men from behind them. Abbott initially saw defendant sitting on the ground with his back to the officers. Abbott was about 10 feet away when he saw defendant stand up and glance back at the officers. Abbott saw a red glue tube cap sticking out of the palm of defendant's hand. Defendant dropped the item on the ground.

The officers walked around the tree and approached defendant from the front. Defendant kneeled down. He appeared to be attempting to pick up something on the ground. Abbott saw a black fanny pack on the ground in front of defendant. The officers told defendant to stand up. As he did so, defendant handed the fanny pack to Carroll, stating, "'You can search it. I have nothing.'" The officers looked through the bag and found two cell phones, a black and white notebook containing a "pay/owe sheet" (ledger), a bag of rubber bands, and about $360 in different denominations. Defendant told Abbott the two cell phones were his.

When searching the area where defendant had been sitting, Carroll found a red Super Glue tube on the ground. Inside the tube were two bindles of heroin. The parties stipulated the officers found two bindles of heroin weighing .12 and .09 grams inside the glue tube and each bindle contained a usable amount. The officers did not find anything

else in the area and defendant did not appear to be under the influence. Defendant was placed under arrest and transported to the station.

After arriving at the station about 30 minutes later, defendant's two cell phones began ringing. Within a five-minute period, they rang at least 10 times. Abbott answered the phones. During the first call, someone identified himself as Big Sapo. Abbott asked him what he needed. Big Sapo said, "I need three" and he wanted "three tadpoles." Based on Abbott's expertise as an undercover narcotics officer, he concluded this meant the caller wanted three bindles of heroin. The second caller identified herself as Christa and said she needed two. Abbott believed this meant she wanted two bindles of heroin.

Narcotics detective Matthew Lackey testified defendant possessed the heroin for sale. Lackey said he based his expert opinion testimony on the presence of heroin, the relatively large amount of cash in various denominations found in defendant's pocket, and the fact defendant was not under the influence or in possession of any drug paraphernalia. Lackey believed the large amount of cash in defendant's possession was proceeds from defendant's heroin sales earlier that day. Lackey also relied on evidence of the incoming calls Abbott received from Big Sapo and Christa, who Lackey believed were purchasers calling defendant for heroin. In addition, Lackey testified the ledger was a record keeping log of defendant's drug sales. He used the ledger "to ensure he's not losing money and he knows who owes him and he knows who he sold to." The name Sap was in the ledger. Lackey believed Sap referred to Big Sapo. Lackey testified that the numerous calls on defendant's cell phones and the large number of names and entries in defendant's ledger indicated defendant had a large volume business selling heroin.

4

In concluding defendant was in possession of heroin for sale, Lackey also relied on evidence there were close to 10 text messages on the two phones. The texts referenced defendant's name and contained drug sales terms, such as "re-upping," which meant "out of a quantity", and "[v]ente," which was a common street term for $20 worth of heroin. The text message, "Let me know when you got something" was a common phrase for "Let me know when you're holding" or when "you have some product." The text messages, "Need something" and "Rather get your stuff" were also drug related. Lackey testified the text message, "You said you would be open," meant defendant was not in his usual location with drugs when the texter was looking for him. Also, the text, "I want three, Ted wants two," was an order for heroin.

Lackey explained that the text messages indicated defendant's heroin sales business required him to be at a certain location selling heroin or his customers would get sick. Defendant's usual time for sales was not 2:00 or 3:00 p.m., when defendant was arrested. By that time, numerous sales had already been made. When asked if Lackey believed defendant nevertheless still possessed the heroin for sale when defendant was arrested, Lackey replied, "Without a doubt. I just think Investigator Abbott was late." Lackey said he did not believe defendant possessed the heroin for personal use, although Lackey acknowledged someone who sells drugs can also be a user.

# III

## EXPERT TESTIMONY ON POSSESSION OF HEROIN

Defendant contends his attorney's failure to object to opinion testimony offered by the prosecution's expert witness, law enforcement narcotics detective Matthew Lackey, violated his Sixth Amendment right to effective assistance of counsel.

### A. *Law Applicable to IAC Claims*

Reversal of a conviction based on IAC requires proof that: (1) counsel's performance was deficient when measured against the standard of a reasonably competent attorney, and (2) counsel's deficient performance so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. This court must presume counsel's conduct fell within the wide range of reasonable professional assistance and accord great deference to counsel's tactical decisions. (*In re Crew* (2011) 52 Cal.4th 126, 150 (*Crew*); *People v. Lewis* (2001) 25 Cal.4th 610, 674 (*Lewis*).) If an IAC claim can be determined on the ground of lack of prejudice, a court need not decide whether counsel's performance was deficient. (*Strickland v. Washington* (1984) 466 U.S. 668, 697 (*Strickland*), *Crew,* at p. 150.)

Because it is inappropriate for a reviewing court to speculate about the tactical reasons for counsel's actions, when the reasons are not readily apparent in the record, the court will not reverse unless the record discloses no conceivable tactical purpose. (*Lewis, supra,* 25 Cal.4th at pp. 674-675.) If the record sheds no light on the reasons for counsel's actions, a claim of IAC is more appropriately decided in a habeas corpus proceeding. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

6

*B.  Admissible Expert Testimony on Possession for Sale of Heroin*

Defense counsel's failure to object to Lackey's expert testimony did not constitute deficient performance when measured against the standard of a reasonably competent attorney, because Lackey's testimony was admissible expert testimony.

"As a general rule, the opinion of an expert is admissible when it is '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . .'  (Evid. Code, § 801, subd. (a).)  Additionally, in California:  'Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.'  (Evid. Code, § 805.)"  (*Summers v. A. L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1178 (*Summers*); in accord, *People v. Vang* (2011) 52 Cal.4th 1038, 1048 (*Vang*).)

Although expert testimony is generally inadmissible on common topics jurors of ordinary knowledge and education could decide as intelligently as an expert, "an expert may testify on a subject about which jurors are not completely ignorant.  [Citations.]  In determining the admissibility of expert testimony, 'the pertinent question is whether, even if jurors have some knowledge of the subject matter, expert opinion testimony would assist the jury.'  [Citations.]"  (*People v. Lindberg* (2008) 45 Cal.4th 1, 45.)  We review the trial court's decision to admit or exclude evidence for abuse of discretion.  (*People v. Vieira* (2005) 35 Cal.4th 264, 292.)

As explained by Justice Mosk in *People v. Bassett* (1968) 69 Cal.2d 122, 141:  "'The chief value of an expert's testimony . . . rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his

conclusion . . . it does not lie in his mere expression of conclusion.' (Italics added.) [Citation.] In short, 'Expert evidence is really an argument of an expert to the court, and is valuable only in regard to the proof of the *facts* and the validity of the *reasons* advanced for the conclusions' (Italics added.) [Citations.]" (In accord, *People v. Hunt* (1971) 4 Cal.3d 231, 237 (*Hunt*).)

Here, defendant challenges Lackey's expert opinion testimony regarding the charged offense of possession of heroin for sale. To secure a conviction for possession for sale of a controlled substance, the prosecution must prove beyond a reasonable doubt that the defendant possessed a controlled substance in an amount sufficient to be used "for sale or consumption as a controlled substance," and that the defendant had the specific intent to sell it. (*People v. Parra* (1999) 70 Cal.App.4th 222, 225-226 (*Parra*).) "'Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense.' [Citation.] 'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' [Citation.]" (*People v. Rios* (2013) 222 Cal.App.4th 542, 567-568; *People v. Harris* (2000) 83 Cal.App.4th 371, 374 (*Harris*) [intent to sell controlled substance may be established by circumstantial evidence].)

The testimony of a qualified narcotics expert is sufficient to support a finding that a controlled substance was possessed with the intent to sell. (*People v. Newman* (1971) 5 Cal.3d 48, 53, disapproved on other grounds in *People v. Daniels* (1975) 14 Cal.3d 857, 861; see *Parra, supra,* 70 Cal.App.4th at p. 227 [opinion based on quantity and lack of drug paraphernalia constitutes substantial evidence of intent]; *Harris, supra,* 83

8

Cal.App.4th at pp. 374-375 [opinion based on quantity of marijuana and methamphetamines; manner drugs were transported; and quantity of postage stamps, which were typically used as currency to purchase drugs]; *People v. Carter* (1997) 55 Cal.App.4th 1376, 1377-1378 [opinion based on quantity of rock cocaine]; *People v. Peck* (1996) 52 Cal.App.4th 351, 357 [opinion based on quantity of marijuana].)

In cases involving heroin possession, "it is settled that an officer with experience in the narcotics field may give his opinion that the narcotics are held for purposes of sale based upon matters such as quantity, packaging, and the normal use of an individual. On the basis of such testimony convictions of possession for purposes of sale have been upheld. [Citations.]" (*Hunt, supra,* 4 Cal.3d at p. 237.) This is because, "[i]n the heroin and marijuana situations, the officer experienced in the narcotics field is experienced with the habits of both those who possess for their own use and those who possess for sale because both groups are engaged in unlawful conduct." (*Ibid.*)

The prosecution's narcotics expert, Lackey, testified after hearing investigators Abbott and Furtado testify. He concluded that, although possessing $375 in twenties, tens, fives and ones, "is not a crime and the denominations are not illegal, when you add in everything, the fact that the defendant possessed that money while sitting in a field with heroin, I believe that those are proceeds from the sales of heroin." Lackey further testified that he believed defendant had only two small packages of heroin in his possession because "most of the sales were completed for the day, . . . And I don't base that solely on the money or the heroin. Those could probably go either way. It's a small quantity and a large quantity of money. It probably doesn't seem like a lot, but for these

9

purposes, it's a lot of money. [¶] I base it on the text messages and I base it on the book [ledger] that the defendant has a clear business that he needs to be at a certain time or people get sick. . . . I think Detective Abbott arrested the defendant after numerous sales were made."

Defendant argues his attorney committed IAC by not objecting to Lackey's expert testimony on grounds Lackey expressed an opinion on whether a crime was committed and whether defendant was guilty of the charged offense. Defendant also asserts Lackey improperly commented on defendant's state of mind by testifying he believed defendant possessed heroin for sale, and then stating in detail the evidence upon which he based his opinion.

"A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] 'Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.'" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77; in accord, *Vang, supra,* 52 Cal.4th at p. 1048; *Summers, supra,* 69 Cal.App.4th at p. 1183.) It is also improper for an expert witness to express an opinion as to whether a crime has been committed. (*People v. Torres* (1995) 33 Cal.App.4th 37, 47 (*Torres*).)

Here, Lackey did not testify that he believed defendant was guilty or merely express a general opinion as to whether a crime was committed. Rather, he testified

10

regarding specific circumstances and conduct, which Lackey believed, based on his law enforcement experience, indicated defendant was selling heroin. (*Hunt, supra,* 4 Cal.3d at p. 237.) Lackey's insight and awareness of facts and circumstances indicating drug sales activity, was generally beyond that of a lay person and therefore was helpful to the jury in determining whether there was sufficient circumstantial evidence to find that defendant possessed heroin for sale, as opposed to mere possession, and had the requisite specific intent to sell heroin. Lackey's expert opinion testimony did not usurp the fact finders' function. Rather, it assisted the fact finder in providing insight into the significance of evidence supporting a finding of possession of heroin for sale. As instructed by the court, the jurors were not required to accept Lackey's expert opinion, and could form their own opinion based on the evidence presented.

Defendant's reliance on *Torres, supra,* 33 Cal.App.4th 37, for the proposition Lackey improperly testified defendant was guilty of the charged offense, is misplaced. *Torres* is distinguishable in that the *Torres* defendant was charged with robbery and murder, not possession for sale of a controlled substance. Defendant's drug-related crime involved facts beyond the common experience and knowledge of a lay person. A lay person might not understand or appreciate the significance and meaning of coded language used during the phone calls to defendant, in the texts found on defendant's cell phones, and his ledger of sales. Likewise, a lay person might not be aware of the significance of various activities and circumstances common to heroin sales. Lackey's opinion testimony assisted the jury in this regard in determining whether defendant was involved in the sale of heroin.

11

Furthermore, the improper expert testimony in *Torres* was by a police officer testifying as to the legal meaning of the terms "robbery" and "extortion," which usurped the province of the judge. (*Torres, supra,* 33 Cal.App.4th at pp. 45-46.) In the instant case, Lackey did not define any legal terms. In addition, in *Torres*, the court held the police officer's testimony, that the defendant had engaged in robbery, was tantamount to stating defendant was guilty of robbery and first degree felony murder. (*Id.* at pp. 42, 46-47.)

Lackey did not similarly testify directly to guilt. Although he indicated he believed defendant possessed heroin for sale, he provided additional testimony enumerating the various factors and circumstances leading him to believe this. He relied on evidence that a lay person might not have realized supported a finding of intent to sell heroin. His testimony therefore was admissible, even though it encompassed ultimate issues, because it concerned matters beyond common experience, that might assist the jury in determining whether defendant possessed the heroin with intent to sell it. (*Vang, supra,* 52 Cal.4th at p. 1048; *People v. McDonald* (1984) 37 Cal.3d 351, 371, overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 914; *People v. Valdez* (1997) 58 Cal.App.4th 494, 506; Evid. Code, § 801, subd. (a).) We conclude defense counsel could have reasonably declined to object to Lackey's expert testimony because it was proper and not likely to be excluded. Defendant therefore has not established that his attorney's failure to object to Lackey's testimony constituted IAC.

IV

SEARCH OF DEFENDANT'S CELL PHONES

Defendant contends he received ineffective representation or, alternatively, defense counsel exceeded his authority by waiving defendant's Fourth Amendment rights, when his trial attorney stipulated to the prosecution searching text messages on defendant's two cell phones and photographing the text messages. We conclude defendant has not established IAC.

At a trial readiness conference on June 27, 2012, defense counsel, who was standing in for defendant's trial attorney, told the court that defendant's trial attorney and defendant stipulated that the district attorney investigator "can go to the property room where the two cell phones were booked into evidence and can go into those cell phones to retrieve text messages and to ascertain the telephone numbers that belong to those numbers so we can find out who they belong to. If the Court can make an order so that we can go do that." In response, the trial court asked, "That has already been stipulated to; correct?" Defense counsel stated, "Yes." The trial court then agreed to "order that pursuant to the stipulation on Mr. Quinones' matter, that the district attorney is allowed to obtain any cell phones from the property of Mr. Quinones so they can review the phone numbers, registered users, and text messages. [¶] . . . [¶] . . . And to take photographs of the text messages." The trial court again inquired, "That is pursuant to the previous stipulation?" Defense counsel confirmed the order was "fine."

Defendant was present and did not object to defense counsel's representations regarding the stipulation or to the trial court ordering, pursuant to the stipulation, the

13

prosecutor reviewing the phone numbers, registered users, and text messages on defendant's two cell phones, and also photographing the text messages. The hearing minute order states that defendant was present at the June 27, 2012 hearing, he was represented by counsel, and counsel stipulated that the prosecution was permitted to obtain defendant's cell phones to review phone numbers and texts, and was allowed to take photographs of them.

Citing *Riley v. California* (2014) 134 S.Ct. 2473, defendant argues that the warrantless search of his cell phones violated his Fourth Amendment guarantee against unreasonable search and seizure. In *Riley*, the United States Supreme Court held that a warrant is generally required before searching a cell phone for data, even if the phone is seized incident to arrest. The *Riley* court concluded interests in protecting the officers' safety and preventing destruction of evidence did not justify dispensing with the warrant requirement for searches of cell phone data. (*Id.* at pp. 2493-2495.) *Riley* is not dispositive because in the instant case there is substantial evidence that defendant personally waived his Fourth Amendment rights against unreasonable searches of his cell phones.

Defendant argues the record does not clearly establish defendant knowingly and intelligently waived his Fourth Amendment rights against search and seizure of his cell phones. In *People v. Bravo* (1987) 43 Cal.3d 600 (*Bravo*), the Supreme Court rejected the argument that a probation condition waiving Fourth Amendment search and seizure protections should be narrowly construed. The court noted that case law applies a strict standard to waivers of constitutional rights generally but does not strictly construe

14

waivers of Fourth Amendment protection, such as consent to searches. (*Id.* at pp. 606-607; in accord, *In re Curtis T.* (1989) 214 Cal.App.3d 1391, 1395 (*Curtis T.*)

The *Bravo* court relied on *Schneckloth v. Bustamonte* (1973) 412 U.S. 218 (*Schneckloth*), in which the United States Supreme Court stated: "There is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment. Nothing, either in the purposes behind requiring a 'knowing' and 'intelligent' waiver of trial rights, or in the practical application of such a requirement suggests that it ought to be extended to the constitutional guarantee against unreasonable searches and seizures. [¶] A strict standard of waiver has been applied to those rights guaranteed to a criminal defendant to insure that he will be accorded the greatest possible opportunity to utilize every facet of the constitutional model of a fair criminal trial. Any trial conducted in derogation of that model leaves open the possibility that the trial reached an unfair result precisely because all the protections specified in the Constitution were not provided. . . .

"The protections of the Fourth Amendment are of a wholly different order, and have nothing whatever to do with promoting the fair ascertainment of truth at a criminal trial. . . . The guarantees of the Fourth Amendment stand 'as a protection of quite different constitutional values—values reflecting the concern of our society for the right of each individual to be let alone. . . .' [Citation.] [¶] Nor can it even be said that a search, as opposed to an eventual trial, is somehow 'unfair' if a person consents to a search. . . . And, unlike those constitutional guarantees that protect a defendant at trial, it

15

cannot be said every reasonable presumption ought to be indulged against voluntary relinquishment." (*Schneckloth, supra,* 412 U.S. at pp. 241-243.)

Relying on *Schneckloth*, the California Supreme Court in *Bravo, supra,* 43 Cal.3d 600 concluded the strict test of waiver and principles of narrow construction have no application in determining the scope of the defendant's consent to search given as a condition to the grant of probation. The *Bravo* court instead interpreted the defendant's waiver of his Fourth Amendment rights on the basis of an objective test. (*Id.* at pp. 606-607; in accord, *Curtis T., supra,* 214 Cal.App.3d at p. 1396.) *Bravo* and *Schneckloth* support the proposition that "a strict and formal waiver of Fourth Amendment rights is not required as a prerequisite in obtaining consent to allow a search." (*Curtis T.,* at p. 1397.) In the instant case, the record shows that defendant personally agreed to allow the prosecution to review the phone numbers and text messages on defendant's two cell phones, and also to photograph the text messages on the phones. Defendant was present when his attorney told the court defendant had personally agreed to the cell phone stipulation, and defendant did not object or disagree.

Under such circumstances, in which defendant's attorney informed the court, in defendant's presence, that defendant had personally stipulated to the prosecution looking at his phones and photographing text messages, we conclude the record provides sufficient evidence establishing that defendant intentionally and knowingly waived his Fourth Amendment search and seizure rights to his cell phones. (*Brewer v. Williams* (1977) 430 U.S. 387, 404.) Defendant's attorney therefore did not commit IAC by not

16

objecting to the prosecution having access to defendant's two cell phones, reviewing text messages on the phones, and photographing the text messages.

We also reject defendant's alternative contention his trial attorney exceeded his authority by waiving defendant's Fourth Amendment rights. The record not only shows defendant personally waived his Fourth Amendment rights but, in addition, there is no showing of prejudice. Even assuming under *Riley*, the prosecution could not legally search defendant's phones without a warrant, it is highly probable the trial court would have granted the prosecution a warrant to search defendant's cell phones, if requested. In turn, the same evidence would have been introduced at trial and defendant would have received the same verdict. (*Strickland, supra,* 466 U.S. at p. 697.)

Issuance of a search warrant requires "'a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing.'" (*People v. Carrington* (2009) 47 Cal.4th 145, 161, quoting *People v. Kraft* (2000) 23 Cal.4th 978, 1040.) In determining whether to grant a warrant, the issuing magistrate must consider whether, "given all the circumstances set forth in the affidavit before him [or her], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (*Illinois v. Gates* (1983) 462 U.S. 213, 238; in accord, *Carrington,* at p. 161.) We give deferential review to this determination of probable cause. (*Ibid.*)

Here, the prosecution had ample evidence to support a search warrant for defendant's cell phones. Defendant admitted the fanny pack and cell phones found inside

17

the fanny pack belonged to him. Defendant was also observed holding the glue tube containing two bindles of heroin, and the ledger book found nearby also supported a finding defendant was selling narcotics. The totality of the evidence, apart from the phone evidence, indicated there was a high probability defendant was using the phones to sell heroin. The evidence was thus more than sufficient to support a search warrant for defendant's two cell phones, to allow the prosecution to search the phones for evidence defendant was selling heroin.

Any failure by defense counsel to object to allowing the prosecution to search defendant's cell phones or any improper waiver of defendant's Fourth Amendment search and seizure rights, was harmless error because it is highly probable the trial court would have granted a search warrant, allowing the prosecution to search defendant's cell phones, had defendant and his attorney not consented to the search.

V

CALCRIM INSTRUCTION NO. 225

Defendant contends the trial court's failure to give sua sponte CALCRIM No. 225 violated his due process right to a properly instructed jury, to present a complete defense, and to a fair trial. Alternatively, defendant argues his attorney provided IAC by not requesting CALCRIM No. 225. Defendant argues that the failure to give CALCRIM No. 225 was prejudicial because it allowed the jury to find him guilty without finding he had the required special intent to sell the heroin. Defendant asserts the jury could have concluded the heroin was possessed for use, without finding defendant harbored the specific intent to sell it at the time of the offense. We disagree. The totality of the

18

instructions, in the absence of CALCRIM No. 225, sufficiently instructed the jury on the element of specific intent based on circumstantial evidence.

The parties did not request, and the trial court did not give, CALCRIM No. 225, which states that the People must prove not only that the defendant did the act charged, but also that the defendant acted with a particular intent, as defined by the instruction for the charged crime. The instruction further states that intent may be proved by circumstantial evidence and that, before the jury may rely on circumstantial evidence, the jury must be convinced that the People proved each fact essential to that conclusion beyond a reasonable doubt. If the jury can draw two or more reasonable conclusions from the circumstantial evidence, the jury must conclude that the required intent was not proved by the circumstantial evidence.

The Bench Notes for CALCRIM No. 225 state: "The court has a **sua sponte** duty to instruct on how to evaluate circumstantial evidence if the prosecution substantially relies on circumstantial evidence to establish the element of a specific intent or a mental state. [Citation.] [¶] Give this instruction when the defendant's intent or mental state is the only element of the offense that rests substantially or entirely on circumstantial evidence. If other elements of the offense also rest substantially or entirely on circumstantial evidence, do not give this instruction. Give CALCRIM No. 224, *Circumstantial Evidence: Sufficiency of Evidence*. [Citations.]" The Bench Notes for CALCRIM No. 224 state: "If intent is the only element proved by circumstantial evidence, do not give this instruction. Give CALCRIM No. 225, *Circumstantial Evidence: Intent or Mental State*. [Citation.]"

19

This court determines whether a jury instruction correctly states the law under the de novo standard of review. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088 (*Ramos*).) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.] '"In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*Ibid.*)

Construed in light of these principles, and in the context of the instructions as a whole, the absence of CALCRIM No. 225 does not constitute prejudicial error. (*Ramos, supra,* 163 Cal.App.4th at p. 1088.) The trial court sufficiently instructed the jury on determination of the specific intent element based on circumstantial evidence. The court gave CALCRIM Nos. 223 (circumstantial evidence defined), 224 (circumstantial evidence; sufficiency of evidence), and 251 (union of act and intent; specific intent or mental state). Instruction on intent was also provided in CALCRIM Nos. 2302 (elements of the charged crime, possession of a controlled substance for sale) and 2304 (elements of the lesser included offense, possession of a controlled substance).

Even assuming the trial court erred in not giving sua sponte CALCRIM No. 225 (*People v. Hughes* (2002) 27 Cal.4th 287, 347), any such error was harmless error under *People v. Breverman* (1998) 19 Cal.4th 142, 178, because the instructions, as a whole,

20

adequately instructed the jury regarding finding specific intent based on circumstantial evidence. It is not reasonably probable defendant would have obtained a more favorable outcome had the trial court given CALCRIM No. 225 instead of CALCRIM No. 224. We reject defendant's IAC challenge for the same reason: defendant was not prejudiced by the court not giving CALCRIM No. 225. There is not a reasonable probability that the outcome would have been more favorable, had defense counsel requested CALCRIM No. 225. (*Crew, supra,* 52 Cal.4th at p. 150.)

VI

ADMISSIBILITY OF CLETS REPORT

Defendant asserts he received ineffective representation when his attorney failed to object to the prosecutor introducing into evidence a CLETS report to prove defendant's 2004 prior conviction allegation under Health and Safety Code section 11370.2, subdivision (a).

*A. Background Facts and Procedure*

During a bifurcated court trial on sentence enhancements, the trial court heard testimony and reviewed evidence concerning the special allegation that defendant previously served prison sentences under sections 667 and 667.5, and was convicted of three prior crimes, including violating Health and Safety Code section 11351 in 2004. District Attorney Forensic Technician Linda Risaliti testified she assisted attorneys with preparing for trials, including processing fingerprint, photograph, and fingerprint comparison evidence. Risaliti had training on how to review 969b packets and had testified in court regarding 969b packets over 70 times. Risaliti explained that a 969b

21

packet consists of documents and paperwork on an individual that has been sentenced to prison. Risaliti stated she had reviewed two prison packets (969b packets) relating to defendant's convictions in 1992 and 2010 for violating sections 459 and 666 (exhs. 3 and 4). Risaliti was shown the two 969b packets in court, and compared the fingerprints in the 969b packets with a ten print fingerprint card of defendant's fingerprints. Risaliti testified the fingerprints on the fingerprint card matched those in the two 969b packets.

The prosecutor also requested admission into evidence of a copy of the CLETS report (exh. 2), containing defendant's criminal history. Defense counsel stated he had no objection, and the CLETS report was received into evidence. The prosecutor described the CLETS report as a certified rap sheet belonging to defendant and noted the California Department of Corrections (CDC) number listed on the rap sheet matched defendant's CDC number on the 969b packets. The CLETS report shows defendant pled guilty on July 26, 2004, and was convicted of violating Health and Safety Code section 11351. The CLETS report included a signed statement, dated the same day as the bifurcated trial on defendant's priors, certifying that the CLETS report was a true and original document received from CLETS by the district attorney's records section.

Defense counsel declined to provide any argument refuting that defendant suffered a section 11351 conviction in 2004. After counsel submitted on the matter, the trial court found defendant suffered the 2004 conviction and therefore found true the section 11370.2, subdivision (a), prior conviction sentence enhancement allegation.

22

*B. Discussion*

Defendant argues his trial attorney's failure to object to the trial court admitting into evidence the CLETS report constituted IAC because the CLETS report was inadmissible hearsay evidence, the section 969b hearsay exception does not apply to a CLETS report, and the CLETS report was the only evidence supporting defendant's sentence enhancement based on his 2004 prior conviction.

Section 969b provides in relevant part:  "For the purpose of establishing prima facie evidence of the fact that a person being tried for a crime or public offense under the laws of this State has been convicted of an act punishable by imprisonment in a state prison, county jail or city jail of this State, and has served a term therefore in any penal institution, . . . the records or copies of records of any state penitentiary, reformatory, county jail, city jail, or federal penitentiary in which such person has been imprisoned, when such records or copies thereof have been certified by the official custodian of such records, may be introduced as such evidence."

Section 969b "is essentially a 'hearsay exception' that allows certified copies of the specified records 'to be used for the truth of the matter asserted in those records,' i.e., that a person served a prison term for a prior conviction.  [Citation.]  However, section 969b '"is permissive and not mandatory. . . .  [I]t does not restrict the People from using other forms of proof . . ."' to establish the fact of previous imprisonment.  [Citation.]' [Citation.]"  (*People v. Martinez* (2000) 22 Cal.4th 106, 116 (*Martinez*).)

Section 969b is inapplicable to a CLETS report because the CLETS report is not a record from a state penitentiary, reformatory, county jail, city jail, or federal penitentiary.

Nevertheless, it is admissible to establish a prison prior if it satisfies applicable rules of admissibility, such as the official records hearsay exception (Evid. Code, § 1280; *Martinez, supra,* 22 Cal.4th at p. 116.) In *Martinez*, the court rejected defendant's argument that, by not referring to CLETS and other criminal records data banks in enacting or amending several statutes expressly dealing with the use of computer records, the Legislature indicated CLETS records could not be used as evidence of prior convictions and service of prior prison terms. (*Martinez,* at p. 119.)

Evidence Code section 1280 defines the official records hearsay exception as follows: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applies: [¶] (a) The writing was made by and within the scope of duty of a public employee. [¶] (b) The writing was made at or near the time of the act, condition, or event. [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness." "A trial court has broad discretion in determining whether a party has established these foundational requirements. [Citation.]" (*Martinez, supra,* 22 Cal.4th at p. 120.) A reviewing court may overturn the trial court's exercise of discretion ""only upon a clear showing of abuse."" [Citations.]" (*Ibid.*) The trial court's ruling on admissibility in the instant case implies that, whatever finding of fact is prerequisite to applying the hearsay exception, a separate or formal finding was unnecessary. (Evid. Code, § 402, subd. (c); *Martinez,* at p. 120.)

24

Unlike the business records hearsay exception (Evid. Code, § 1271), the official records hearsay exception "'permits the court to admit an official record or report without necessarily requiring a witness to testify as to its identity and mode of preparation if the court takes judicial notice or if sufficient independent evidence shows that the record or report was prepared in such a manner as to assure its trustworthiness.'" (*Martinez, supra*, 22 Cal.4th at p. 129, quoting the Cal. Law Revision Com. com., reprinted at 29B pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1280, p. 347.)

In the instant case, defendant argues the official records hearsay exception (Evid. Code, § 1280) was inapplicable to the CLETS report because the prosecution did not establish the third element of the official records hearsay exception, which requires a showing of its trustworthiness. (Evid. Code, § 1280, subd. (c).) But *People v. Dunlap* (1993) 18 Cal.App.4th 1468 and *Martinez* support the proposition defendant's certified CLETS report was admissible under the official records hearsay exception because it is a trustworthy document. In *Dunlap*, the court held a certified CLETS report was admissible under the official records hearsay exception, even though there was no testimony regarding preparation of the printout, based on "the presumption that official duty was regularly performed to satisfy itself that the record was sufficiently trustworthy." (*Id.* at p. 1480.)

*Martinez* also supports the proposition the certified CLETS in the instant case is admissible. In *Martinez, supra*, 22 Cal.4th 106, the Supreme Court held that the trial court did not abuse its discretion in ruling an uncertified CLETS report was admissible under the official records hearsay exception. (*Id.* at pp. 129, 134.) The *Martinez* court

25

based its holding in part on the fact the trial court could take judicial notice of the statutes that require public entities, such as the DOJ, Attorney General, and local law enforcement agencies, to report and record dates of crimes and convictions. (*Martinez, supra,* 22 Cal.4th at pp. 121-125.) Those statutes (§§ 11101, 11104, 11105, 11107, 11115-11117, 13100, 13125, 13150-13152, 13175-13176; CLETS statutes, Gov. Code, §§ 15150-15167) "establish that the sources of the information in the CLETS printout were public employees of California who had a duty to observe, report, record, and disseminate the information. . . . Under these statutes, 'the public employees involved in the recording or reporting of criminal offender record information in the CLETS system have a duty to employ methods ensuring a reasonable level of accuracy and reliability.' [Citation.]" (*Martinez, supra,* 22 Cal.4th at pp. 129-130.) The *Martinez* court also noted that the Legislature enacted statutes (§§ 11120-11121, 11124, 11126) affording defendants an opportunity to refute any erroneous or inaccurate criminal history information stated in a CLETS report. (*Martinez,* at p. 131.)

In rejecting the *Martinez* defendant's contention the CLETS report was not trustworthy, because it was a government computer record, the *Martinez* court stated: "Defendant's arguments are unpersuasive. First, as we have already explained, in 1971 the Legislature statutorily established a process for review and correction of the criminal history information in the Department's possession. (§ 11120 et seq.) . . . Second, our courts have refused to require, as a prerequisite to admission of computer records, testimony on the 'acceptability, accuracy, maintenance, and reliability of . . . computer hardware and software.' [Citation.]" (*Martinez, supra,* 22 Cal.4th at p. 132.)

26

Defendant attempts to distinguish *Martinez*, by arguing that in *Martinez*, the prosecution presented additional evidence establishing the trustworthiness of the CLETS report, which included testimony by a district attorney paralegal, who generated the printout. There also was testimony by a deputy sheriff, who had previously questioned the defendant about his criminal history and to whom the defendant made admissions consistent with the computer printout. (*Martinez, supra,* 22 Cal.4th at p. 131.) Although there was no similar testimony in the instant case establishing trustworthiness of the CLETS report, it was not required because, unlike in *Martinez*, the CLETS report was certified. It contained a certification stamp on the last page, which was signed by a district attorney records section employee, and the stamp was dated the day the document was introduced into evidence. Certification of the CLETS report was sufficient to establish the third element of the official records hearsay exception, without presenting additional testimony establishing trustworthiness. We therefore reject defendant's IAC challenge, since the CLETS report was admissible under the official records hearsay exception.

VII

*ROMERO* MOTION

Defendant contends the trial court abused its discretion in denying his *Romero* motion to dismiss his 1992 prior serious felony conviction under section 1385. We disagree.

27

*A. Procedural Background and Facts*

Defendant was charged with suffering a prior serious felony conviction under sections 667, subdivisions (c) and (e)(1), and 1170.12, subdivision (c)(1). On September 16, 1992, defendant sustained the prior conviction for burglary (§ 459). During a bifurcated trial on defendant's prior conviction enhancements, the prosecution presented evidence establishing the 1992 prior strike conviction (1992 prior) and the trial court found true the allegation.

Defendant filed a motion under *People v. Superior Court* (*Romero*)*, supra,* 13 Cal.4th 497, requesting the trial court to dismiss his 1992 prior under section 1385, subdivision (a). Defendant argued doing so was warranted based on the nature and circumstances of his present and prior felony convictions, and based on his background, character, and prospects. The prosecution opposed the motion on grounds the 1992 prior was not remote in relation to defendant's entire criminal history.

At the hearing on the motion, the trial court acknowledged defendant did not have a history of committing any violent crimes but he had been unable to restrain himself from perpetrating crimes. Defendant "can't seem to stay out of trouble long enough to prove he can be a law-abiding citizen." The trial court denied defendant's *Romero* motion, explaining: "[I]t's a one strike case, and I notice in some of these cases, Mr. Quinones got 365. He hasn't suffered much consequence of that strike before in terms of going to prison. He never seems to learn, and I think the whole spirit of the three strike law is that the ante goes up when the conduct doesn't get better. [¶] And so I'm going to

deny the motion on that basis.  If there had been a long period of time, or this was a [de ]minimis offense, I would consider it. . . ."

*B.  Applicable Law*

Section 1385, subdivision (a), vests the trial court with discretion to dismiss a qualifying strike conviction in furtherance of justice, but such discretion must be exercised in strict compliance with section 1385, subdivision (a).  (*People v. Superior Court* (*Romero*)*, supra,* 13 Cal.4th at p. 530; *People v. Williams* (1998) 17 Cal.4th 148, 158 (*Williams*).)  "[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law . . . or in reviewing such a ruling, the court . . . must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the [three strikes] scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies."  (*Williams,* at p. 161.)  These factors are commonly referred to as the "*Williams* factors."

We review the trial court's decision not to dismiss a prior strike allegation under section 1385 for abuse of discretion.  (*People v. Carmony* (2004) 33 Cal.4th 367, 376.)  "[T]he three strikes law not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify its decision to do so.  In doing so, the law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper.  [¶] . . . [¶] . . . '[I]t

29

is not enough to show that reasonable people might disagree about whether to strike one or more' prior conviction allegations. . . . Because the circumstances must be 'extraordinary . . . by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack' [citation], the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary." (*Id.* at p. 378.)

*C. Discussion*

Defendant contends the trial court abused its discretion in failing to dismiss his 1992 prior, which occurred in 1992, 21 years before the trial in the instant case. Defendant argues the trial court's decision denying his *Romero* motion was arbitrary and irrational because consideration of the *Williams* factors compelled a finding defendant did not fall within the spirit of the three strikes law and therefore his 1992 prior conviction should have been stricken.

With regard to the *Williams* factors, defendant asserts his present minor, nonviolent drug offenses, coupled with his drug abuse, do not support a finding he falls within the spirit of the three strikes law. Defendant also argues he was not the type of career criminal or flagrant recidivist who poses a danger to society, justifying an enhanced sentence. The majority of defendant's prior convictions were nonviolent theft and drug-related crimes. Defendant suffered only one prior serious felony conviction, the 1992 conviction for first degree burglary. Defendant argues the remoteness of the

30

conviction should operate as a mitigating factor, since his charged offenses were not particularly egregious. As to defendant's background, character, and prospects, defendant states he earned his Generalized Education Development certificate (GED), went to upholstery trade school, and during the last 15 to 20 years, worked as a landscaper.

Defendant has not established the trial court abused its discretion in denying his *Romero* motion. Defendant has not led a crime-free life after suffering his strike conviction in 1992. (*Williams, supra,* 17 Cal.4th at p. 163 [passage of 13 years between strike offense and new offense not significant given defendant's failure to refrain from criminal activity in the interim]; *People v. Humphrey* (1997) 58 Cal.App.4th 809, 813 (*Humphrey*) [trial court abused its discretion by striking 20-year-old prior where defendant did not subsequently lead a legally blameless life]; *People v. Jefferson* (2007) 154 Cal.App.4th 1381, 1388 [declining to strike 22-year-old strike].) Defendant has at least 15 convictions between 1978 and 2010, resulting in being placed on probation and incarcerated on numerous occasions. Defendant also violated parole or probation after the 1992 prior at least six times. In addition, defendant's 1992 conviction for residential burglary was one of eight felony convictions defendant committed prior to the charged offenses, and at the time of the charged crimes in December 2011, defendant was on parole for committing petty theft with a prior theft related conviction (§ 666).

As the court in *Humphrey, supra,* 58 Cal.App.4th at page 813, articulately stated regarding remote prior convictions: "We must add a new category to the list of improper bases for the striking of a prior. In determining whether a prior conviction is remote, the

trial court should not simply consult the Gregorian calendar with blinders on. To be sure, a prior conviction may be stricken if it is remote in time. In criminal law parlance, this is sometimes referred to as 'washing out.' [Citations.] The phrase is apt because it carries the connotation of a crime-free cleansing period of rehabilitation after a defendant has had the opportunity to reflect upon the error of his or her ways. Where, as here, the defendant has led a continuous life of crime after the prior, there has been no 'washing out' and there is simply nothing mitigating about a 20-year-old prior. Phrased otherwise, the defendant has not lead a 'legally blameless life' since the 1976 prior. [Citations.] Far from being 'washed out,' this prior was 'dyed in.'"

As to defendant's background, character, and prospects, they also are not particularly favorable. Defendant has only a tenth grade education and, contrary to defendant's statement in his appellant's opening brief, the probation report states he did not earn his GED. Although defendant was self-employed as a landscaper, his age of 54 years at the time of sentencing and his physical condition, after abusing drugs since the age of 14, including heroin since age 16, may limit his prospects of future self-employment upon release from prison. Furthermore, his lengthy history of recidivism and substance abuse supports the trial court's finding that defendant falls within the spirit of the three strikes law. The record shows the trial considered the *Williams* factors, balanced the relevant facts, and did not abuse its broad discretion when denying defendant's *Romero* motion.

## VIII

## CUMULATIVE ERROR

Defendant asserts reversal of his convictions is required based on the cumulative effect of errors collectively undermining the fundamental fairness of his trial and the reliability of his guilty verdict.  Because we have found no errors, defendant's claim of cumulative error also fails.  (*People v. Seaton* (2001) 26 Cal.4th 598, 639.)

## IX

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>CODRINGTON</u>
J.

We concur:


<u>KING</u>
Acting P. J.


<u>MILLER</u>
J.